UNITED STATES of America,
Plaintiff–Appellee,

v.

James L. KEEN, Defendant–Appellant.

No. 95–10183.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 8, 1996.

Decided Sept. 18, 1996.

Rustam A. Barbee, Assistant Federal Public Defender, Honolulu, HI, for defendant-appellant.

Sharon Burnham, Assistant United States Attorney, Honolulu, HI, for plaintiff-appellee.

Before WOOD, Jr.**, CANBY, and RYMER, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge:

On September 23, 1994, James L. Keen was convicted of five counts of bank robbery in violation of 18 U.S.C. § 2113(a), one count of being a felon in possession of a firearm and one count of being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1), and one count of illegal possession of a sawed-off shotgun in violation of 26 U.S.C. § 5861(d). In light of Keen's three prior convictions for violent felonies, he was sentenced to a term of 327 months imprisonment. This appeal followed.

## BACKGROUND

Keen was convicted of robbing five banks within a two-month period. Federal agents were first led to Keen after a teller at the fifth bank observed the license plate number of Keen's car. Keen was arrested as he was about to enter his hotel room on November 10, 1993, the day following the fifth robbery. Inside Keen's room, agents discovered over $1000 in currency, including 10 "bait bills," bills whose serial numbers had been prerecorded by bank officials. Agents also found a loaded shotgun and additional ammunition in the room. The shotgun's barrel had been roughly sawed down and the stock had been cut into a pistol grip. Keen was eventually charged with five counts of bank robbery and four firearms-related counts.

On March 14, 1994, Keen notified the court of his intent to pursue an insanity defense. In response to the government's motion, the court ordered that Keen undergo a psychological evaluation. On the basis of the report prepared by the government's psychologist, which concluded that Keen was merely malingering (and unmoved by Keen's claim that a "giant iguana" had compelled him to commit the robberies), the court concluded that Keen was competent to proceed to trial.

Pending the completion of his psychological evaluation, Keen had begun submitting motions on his own behalf; Rustam A. Barbee, Keen's defense counsel, also filed two motions. After the court concluded that Keen was sufficiently competent, a hearing on the pending motions was held on August 9, 1994, during which the court was informed that Keen wished to proceed *pro se.* The court briefly addressed Keen, and then allowed him to do so. The court also obtained Keen's consent to appoint Barbee to serve as his assistant counsel. Two further hearings were held, during which Keen argued his motions. Following the hearings, the court denied all of the motions.

A final pretrial conference was held on September 19, 1994. At this time, Barbee informed the court that Keen "does not want to participate in this proceeding, nor does he want to participate in the trial scheduled for tomorrow." The court then sought to learn whether Keen was withdrawing his request to represent himself or whether he intended to merely remain silent throughout the proceedings and put the government to its burden of proof. Keen responded to the court's inquiries by stating that he was communicating with God about the trial, that the government was "an anti-Christ," and that the court had no jurisdiction over him. The court was satisfied that Keen was competent, so it concluded he was likely engaging in some ploy. Since Keen refused to answer its questions regarding representation, the court felt constrained to follow Keen's last known position on the subject and it ruled that Keen should be considered as still proceeding *pro se.*

At the September 19 hearing, the court also heard argument on the government's motion *in limine* to preclude Keen's use of the insanity defense. In light of the psychological exam previously conducted by the government, the court's own interactions with Keen, the lack of expert testimony in support of the defense, and Keen's failure to oppose the motion *in limine,* the court grant-

** The Honorable Harlington Wood, Jr., United States Circuit Judge for the Seventh Circuit, sitting by designation.

ed it and precluded the use of the insanity defense.

Jury selection began the next day, September 20, 1994. Keen continued to refuse to participate and he refused to request the reappointment of counsel. During jury selection, Keen wrote a note to the judge in which he claimed to be "physically ill" and "physically and mentally unable to defend himself." As jury selection was nearly completed, the court stated that Keen would have to wait to be examined by a physician. A little while later, after his further requests to leave the courtroom were denied, Keen became physically disruptive: He knocked a water jug off a table, knocked over a microphone, and attempted to kick over a table.[1] In response to Keen's outbursts, the court placed him in a nearby room equipped with a video monitor so that Keen could continue to observe the proceedings without prejudicing the prospective jurors with his behavior.[2] Keen did not, however, expressly waive his right to continue representing himself.

After Keen's removal from the courtroom, Barbee exercised challenges for cause on Keen's behalf. The court then directed Barbee to go and confer with Keen regarding his peremptory challenge. Keen, however, continued to remain silent. Since Barbee had been instructed to "physically exercise the peremptory challenge[s] on [Keen's] behalf," he felt that he lacked the authority to exercise his independent judgment and he waived all peremptory challenges on Keen's behalf.

Prior to the commencement of the opening statements the next day, September 21, Keen stated: "I cannot participate in this trial, or proceed *pro se;* I don't know how." The court took this as an indication that Keen no longer wished to represent himself and it reappointed Barbee to an active role.

The trial proceeded and Keen was eventually convicted of eight of the nine counts brought against him. On March 28, 1995, Keen was sentenced to a term of 327 months

imprisonment and 5 years of supervised release, and he was ordered to pay restitution. This appeal followed.

### ANALYSIS

#### I.

Keen first argues that the court erred when it permitted him to proceed *pro se.* An accused has the constitutional right to self-representation, of course, but the decision to waive the right to counsel is valid only if it is "timely, not for the purposes of delay, unequivocal, and knowing and intelligent." *United States v. Arlt,* 41 F.3d 516, 519 (9th Cir.1994); *Faretta v. California,* 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975). Keen contends that his decision to proceed *pro se* was not knowing and intelligent because the district court failed to fully inform him of the disadvantages he would face.

"We approach the question of whether [the defendant's] waiver was knowing and intelligent with caution, recognizing the serious nature of the inquiry and the Supreme Court's admonition that 'courts indulge in every reasonable presumption against waiver.'" *Arlt,* 41 F.3d at 520 (quoting *Brewer v. Williams,* 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977)). Other circuits have prescribed a meticulous litany to be employed by the district court when it is faced with a prospective *pro se* defendant. *See United States v. McDowell,* 814 F.2d 245, 249–52 (6th Cir.), *cert. denied,* 484 U.S. 980, 108 S.Ct. 478, 98 L.Ed.2d 492 (1987). Although such a methodology may have its advantages, we have never demanded an ironclad approach to this situation. *Arlt,* 41 F.3d at 520. It is not our intention to craft such an approach here. However, we do generally require that the defendant be made aware of the "three elements" of self-representation: "[I]t must be established that the

---

**1.** This behavior had been predicted by the government's psychological report:

Keen does not have a mental disorder, but he can prove to be quite disruptive. He may try to convince the court that a disorder really exists by engaging in self-mutilation or self-injurious behavior. Such behavior cannot be

predicted with any specificity and the best way to manage him during his trial is to monitor his behavior closely....

**2.** All of Keen's outbursts occurred out of the presence of the prospective jury members.

defendant was 'aware of the nature of the charges against him, the possible penalties, and the dangers and disadvantages of self-representation.'" *United States v. Mohawk,* 20 F.3d 1480, 1484 (9th Cir.1994) (quoting *United States v. Balough,* 820 F.2d 1485, 1487 (9th Cir.1987)).

■ The government bears the burden of showing that Keen's waiver of counsel was knowing and intelligent. *Mohawk,* 20 F.3d at 1484. Furthermore, "[t]hroughout this inquiry, we must focus on what the defendant understood, rather than on what the court said or understood." *Balough,* 820 F.2d at 1487–88. In this regard, it is Keen's " 'state of mind at the time he opted for self-representation'" which is crucial. *Mohawk,* 20 F.3d at 1485 (quoting *United States v. Aponte,* 591 F.2d 1247, 1250 (9th Cir.1978)).

The "preferred procedure" by which a court informs a defendant of the three elements of self-representation is through a discussion in open court. *Balough,* 820 F.2d at 1488. Therefore, we will first turn to the colloquy between Keen and the court at the August 9 hearing in order to determine whether Keen's waiver of his right to counsel was knowing and intelligent.

When the district court first asked Keen if it was truly his wish to represent himself, Keen replied: "Yes.... I want to be able to bring up issues as I see them in my case." [3] The following exchange then took place:

THE COURT: Are you prepared to represent yourself? Because, you're talking about not only these motions but trial as well.

THE DEFENDANT: I'm prepared.

THE COURT: You're prepared to pick a jury, and prepare[d] to argue a case to the jury, [and] prepared to cross examine witnesses, and so forth?

THE DEFENDANT: I'm going to give it my best shot.

The court noted that Keen would place the jury in a somewhat difficult situation if he continued to press his insanity defense while

representing himself, to which Keen replied: "[T]he insanity defense is basically I was relying on that fact that at the time of the alleged offense I was insane, not presently." To that, the court responded:

I guess the only thing I can do is to allow him to represent himself, because I'm satisfied from [the government's psychological report] that he is able to assist in his own defense; and so, with that in mind, he certainly can make a choice to defend himself and has the ability to defend himself....

From a review of the transcript, it appears that the district court was primarily concerned with ascertaining whether Keen was competent to waive counsel: "Mr. Keen, I cannot prevent you from representing yourself, if I am satisfied that you're mentally competent to assist in your defense." Since Keen had previously filed notice of his intent to pursue an insanity defense, the court was naturally concerned here. However, it appears from the transcript that this concern with Keen's competency distracted the court to such a degree that it neglected to adequately explain the dangers and disadvantages of self-representation.

The only question the court asked pertaining to Keen's knowledge of the pitfalls he faced was: "You're prepared to pick a jury, and prepare[d] to argue a case to the jury, [and] prepared to cross examine witnesses, and so forth?" Keen and the court also engaged in a brief exchange regarding the burden of proof:

THE DEFENDANT: .... I'm prepared to take this case to trial and prove my innocence.

THE COURT: I hope you understand that you don't have to prove your innocence.

THE DEFENDANT: Well, allow—

THE COURT: —the government has to prove your guilt.

THE DEFENDANT: Okay, they have to prove guilty, right?

---

**3.** Keen's desire to proceed *pro se* seems to have its roots in his frustrated efforts to file certain motions on his behalf. Keen's counsel—who had apparently concluded that these motions were groundless—had refused to file them for him. Keen filed the motions with the magistrate judge anyway, and the magistrate had instructed Keen to cease filing motions on his own behalf.

THE COURT: Uh-huh.[4]

Regrettably, given the overwhelming evidence of Keen's guilt and the inconvenience a retrial would impose on the victims of the robberies and the court system, this discussion appears insufficient. Proof is lacking here "that the defendant understood his or her 'constitutional right to have [a] lawyer perform certain core functions,' and that he or she 'appreciate[d] the possible consequences of mishandling these core functions and the lawyer's superior ability to handle them.'" *Mohawk*, 20 F.3d at 1484 (quoting *United States v. Kimmel*, 672 F.2d 720, 721 (9th Cir.1982)).

 It is true we have recognized that "a limited exception may exist whereby a district court's failure to discuss each of the elements in open court will not necessitate automatic reversal when the record as a whole reveals a knowing and intelligent waiver." *Balough*, 820 F.2d at 1488. In this regard, we look to "'the particular facts and circumstances surrounding that case, including the background, experience and conduct of the accused.'" *Id.* (quoting *Kimmel*, 672 F.2d at 722) (citation omitted). We have "rarely" found this exception to be applicable "unless the case involved 'an unusual fact situation in which the background and experience of the defendant in legal matters was apparent from the record.'" *Balough*, 820 F.2d at 1488 (quoting *United States v. Harris*, 683 F.2d 322, 324 (9th Cir.1982)).

With that admonition in mind, there are three factors regarding Keen's background and experience which tend to demonstrate at least some familiarity with legal matters. First, the government's psychological report notes that Keen "worked as a 'temp' for several months including working as a ... law clerk for the state Attorney General for one month."

Second, Keen was twice convicted in the past for bank robbery. It could be argued, therefore, that Keen was aware of two of the three elements of self-representation—the nature of the charges against him (at least regarding the five bank robbery counts) and the possible penalties. On the other hand, , there is no indication that Keen was aware of the enhanced penalty he faced as a result of these prior convictions under the armed career criminal provisions of 18 U.S.C. § 924(e).

Third, and most significantly, Keen did demonstrate his understanding of at least one of the disadvantages of proceeding *pro se* during the August 9 hearing when he advanced the following argument:

> I realize that I don't have an office and all that amenities that a lawyer would have, and I know it's going to be hard, but I know what I'm getting myself into; and I was going to ask the Court—I don't know if this is appropriate—but I'd still like to ask that I have certain materials that would allow me to represent my case, such as paper and pencils, and access to the law library at Halawa.

From Keen's further statements, it is clear that his limited access to law books and other materials was the *only* disadvantage of proceeding *pro se* that was on his mind:

> There's only one thing that concerns me, and is part of the penalty, I guess, that I'm going to pay for representing myself; [the] government, on one hand, has access to law materials, law books, with the latest cases. I, on the other hand, am not going to have access to those law books. I don't think it's, you know, a fair shake.... [I]t does remove my ability to adequately defend myself ... in preparing whatever motions or defense that I plan to prepare.

Moreover, Keen's concern over his limited access to legal materials does not allow us to conclude that he was possessed of any great wealth of legal experience. Keen had already submitted, or had attempted to submit, several motions by this time and he had thus experienced first-hand the shortcomings of legal research behind bars.

---

4. The court did engage in a more detailed discussion with Keen about the trial process at the final pre-trial hearing. This discussion, however, constituted little more than an overview of the impending proceedings; Keen was not informed of the pitfalls he faced. And, in any case, it is Keen's mental state at the time he sought to exercise his right to self-representation (six weeks earlier) which is crucial. *Mohawk*, 20 F.3d at 1485.

In our view, the record as a whole does not permit the application of the limited exception here.[5] The ramifications of this conclusion are clear:

> If a defendant seeks to represent himself and the court fails to explain the consequences of such a decision to him, the government is not entitled to an affirmance of the conviction it subsequently obtains. To the contrary, the defendant is entitled to a reversal and an opportunity to make an informed and knowing choice.

*Arlt,* 41 F.3d at 521.[6]

In light of our decision to reverse the district court on this issue, the balance of Keen's appeal is rendered moot. We believe, however, that further discussion is warranted here of those issues likely to reemerge upon remand.

## II.

■ Keen next argues that the district court erred by precluding his use of the insanity defense.

> "In general, '[a] defendant is entitled to have the judge instruct the jury on his theory of defense, provided that it is supported by law and has some foundation in the evidence.' Logically, if the parties dispute whether the required factual foundation exists, the court should apply an abuse of discretion standard of review."

*United States v. Duran,* 59 F.3d 938, 941 (9th Cir.), *cert. denied,* — U.S. —, 116 S.Ct. 535, 133 L.Ed.2d 440 (1995) (quoting *United States v. Gomez–Osorio,* 957 F.2d 636, 642 (9th Cir.1992) (quoting *United States v. Mason,* 902 F.2d 1434, 1438 (9th Cir.1990))).

We have adopted the following standard for determining whether there is present a sufficient quantum of evidence to justify a jury instruction on the insanity defense:

"[W]here the issue of insanity has otherwise been properly raised, a federal criminal defendant is due a jury instruction on insanity when the evidence would allow a reasonable jury to find that insanity has been shown with *convincing clarity*.... [T]he trial judge must construe the evidence most favorably to the defendant."

*United-States v. Whitehead,* 896 F.2d 432, 435 (9th Cir.) (emphasis added) (quoting *United States v. Owens,* 854 F.2d 432, 435 (11th Cir.1988)), *cert. denied,* 498 U.S. 938, 111 S.Ct. 342, 112 L.Ed.2d 306 (1990).

The district court preempted Keen's use of the insanity defense because Keen had nothing more to offer in support of the defense than his own testimony and that of his family. In this regard, the district court seemingly based its ruling on the ground that lay testimony is categorically insufficient to demonstrate insanity with convincing clarity:

> [Lay] testimony can only lead to an impermissible finding, that they might speculate that he might be insane. And you can't argue that he is insane from that standpoint of view.... [U]nless someone summarizes all of this testimony, and can give a medical opinion, or scientific expert can give such a medical opinion, then this testimony can only lead to impermissible inference.

Without reaching the question of whether lay opinion alone can ever support a finding of insanity, we can safely state that the record ultimately supports the district court's decision here.

A review of the statements made by Keen's counsel reveals that the proffered evidence of insanity was statutorily insufficient. In the words of Keen's counsel:

> I would anticipate ... putting on evidence that would lead the jury to conclude that there is a good likelihood that Mr. Keen was suffering from a mental disease or

---

**5.** The fact that Keen subsequently argued several motions in a competent fashion is "irrelevant," since this does not serve to establish his state of mind at the time he decided to proceed *pro se. Mohawk,* 20 F.3d at 1485.

**6.** It is true that Keen's counsel was reappointed shortly before oral arguments began, but the effective denial of counsel during the six weeks

prior to trial and during the empaneling of the jury is sufficient to constitute prejudicial error. *See United States v. Cronic,* 466 U.S. 648, 659, 104 S.Ct. 2039, 2047, 80 L.Ed.2d 657 (1984) ("The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial.").

defect at the times relevant to the charges in the indictment.

. . . .

... [W]e do not have an M.D. or a psychologist to testify as an expert. We do have the defendant's family, who observed him during the relevant time period, and they could testify as to what they personally saw, the behavior that he was engaging in, and the things that he said to them ... to show the jury that a person exhibiting this type of symptom, behavior and statements, must have some serious mental disease or defect.

As stated in 18 U.S.C. § 17(a), however, insanity only constitutes a defense if the defendant "was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense." As it appears that Keen's counsel sought to do little more than establish that Keen suffered from a mental disease or defect [7]—as opposed to establishing the effect that this condition had upon his ability to appreciate the nature of his actions—the court did not err in striking Keen's insanity defense.[8] *Whitehead,* 896 F.2d at 435.

### III.

Relying upon *Staples v. United States,* 511 U.S. 600, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994), Keen next contends the district court erred by failing to instruct the jury that it needed to find that he knew of the characteristics of the sawed-off shotgun that subjected it to regulation under 26 U.S.C. § 5861(d). The government initially responded to Keen's argument by contending that the rationale of *Staples* did not apply to sawed-off shotguns since the characteristics which render a sawed-off shotgun subject to regulation are readily ascertainable. See *Staples,* 511 U.S. at ——, 114 S.Ct. at 1800.

However, in a memorandum filed before this panel on June 10, 1996, the government withdrew its argument that the jury instruction was not erroneous. The government states that it is withdrawing its argument on this issue in order to conform to the position taken by the Solicitor General in a brief recently filed before the Supreme Court in *Pulido v. United States,* —— U.S. ——, 116 S.Ct. 1880, 135 L.Ed.2d 175 (1996) (denying *certiorari*). We therefore presume that an adequate instruction will be given on this issue at Keen's retrial.

### IV.

■ Keen last argues that the Double Jeopardy Clause was violated when he was separately convicted and sentenced for simultaneously possessing a firearm and ammunition [9] in violation of 18 U.S.C. § 922(g)(1).[10] Congress unquestionably has the power to punish a felon twice for being simultaneously in possession of a firearm and ammunition. *E.g., Brown v. Ohio,* 432 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977). The question, therefore, is whether it intended to do so when it enacted § 922(g)(1).

---

7. In this regard, all of the supporting cases cited by Keen were decided *prior* to the passage of the Insanity Defense Reform Act of 1984, which dramatically changed the insanity defense. Prior to the 1984 Act, a defendant only needed to "offer[ ] *some evidence* to raise the issue of insanity" in order to shift the burden to the government of proving sanity beyond a reasonable doubt. *United States v. Hartfield,* 513 F.2d 254, 259 (9th Cir.1975) (emphasis added). The defendant now bears the burden of proving insanity by clear and convincing evidence, 18 U.S.C. § 17(b), so these earlier cases are of almost no weight today.

8. The testimony of the bank tellers is also supportive of the district court's decision here as it indicates that Keen was not behaving unusually (for a bank robber) during the robberies. *Whitehead,* 896 F.2d at 436.

9. Keen was sentenced to serve these two terms of imprisonment concurrently, but the government does not dispute Keen's contention that the sentences are not truly concurrent since special assessments were separately imposed on each conviction. *Ray v. United States,* 481 U.S. 736, 737, 107 S.Ct. 2093, 2093–94, 95 L.Ed.2d 693 (1987) (per curiam).

10. Section 922(g)(1) states, in pertinent part:
 It shall be unlawful for any person ... who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year ... to ... possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

Where, as here, a single[11] act or transaction is alleged to have resulted in multiple violations of the same statutory provision, the Supreme Court has stated that the proper inquiry involves the determination of "[w]hat Congress has made the allowable unit of prosecution." *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221, 73 S.Ct. 227, 229, 97 L.Ed. 260 (1952).[12]

*Bell v. United States*, 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955), is illustrative of the Supreme Court's approach to the "allowable unit of prosecution" inquiry. In *Bell*, the Supreme Court invalidated the imposition of separate sentences where the defendant had pleaded guilty to two counts of violating the Mann Act, 18 U.S.C. § 2421 (criminalizing the transportation in interstate commerce of any woman for the purpose of prostitution), each count referring to a different woman. The defendant had transported the two women in the same trip and in the same vehicle and he argued that the statute and legislative history were not specific enough to permit the assumption that Congress intended to authorize multiple punishments. Although the Court conceded that a reasonable construction of the statute would permit multiple punishments, it nonetheless concluded:

> When Congress has the will it has no difficulty in expressing it—when it has the will, that is, of defining what it desires to make the unit of prosecution and, more particularly, to make each stick in a faggot a single criminal unit. When Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the

ambiguity should be resolved in favor of lenity. And this not out of any sentimental consideration, or for want of sympathy with the purpose of Congress in proscribing evil or anti-social conduct. It may fairly be said to be a presupposition of our law to resolve doubts in the enforcement of a penal code against the imposition of a harsher punishment.

*Id.* at 83, 75 S.Ct. at 622. *See also Ladner v. United States*, 358 U.S. 169, 178, 79 S.Ct. 209, 214, 3 L.Ed.2d 199 (1958) (holding that only one violation of 18 U.S.C. § 254 (1940) occurred when two officers were wounded by a single discharge of firearm).

The question before us therefore is whether Congress intended for the simultaneous possession of a firearm and ammunition to constitute separate units of prosecution under § 922(g)(1). The case primarily relied upon by Keen, a decision of the Fifth Circuit, answers this question in the negative:

> The evil Congress sought to suppress by section 922 was the arming of felons; the section is based on the status of the offender and not the number of guns possessed. For the same reasons, we cannot conclude that Congress intended the simultaneous possession of ammunition to stand as a distinct unit of prosecution.

*United States v. Berry*, 977 F.2d 915, 919 (5th Cir.1992) (footnote omitted).

An analogous case from this circuit also lends support to Keen's position. In *Brown v. United States*, 623 F.2d 54 (9th Cir.1980), we addressed § 922(a)(6), which prohibits the

---

**11.** Guns that are acquired at different times or stored in separate places permit separate punishment to be imposed for each violation of § 922(g). *United States v. Wiga*, 662 F.2d 1325, 1336 (9th Cir.1981), *cert. denied*, 456 U.S. 918, 102 S.Ct. 1775, 72 L.Ed.2d 178 (1982). We need not decide whether the same principle would apply to a gun and its ammunition, which arguably are less dangerous stored apart than together, because there was no evidence here that Keen separately possessed or stored the two.

**12.** In its brief, the government argued that the test of *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), permits double punishment because each charge requires proof of an element not required by the other. The *Blockburger* test, however, is generally applicable when "the same act or transaction

constitutes a violation of *two distinct statutory provisions.*" *Id.* (emphasis added). In this case, Keen's "same act"—the simultaneous illegal possession of a firearm and ammunition—constitutes a violation of only one statutory provision, § 922(g)(1). *Compare Braverman v. United States*, 317 U.S. 49, 54, 63 S.Ct. 99, 102, 87 L.Ed. 23 (1942) *with Albernaz v. United States*, 450 U.S. 333, 339–40, 101 S.Ct. 1137, 1142–43, 67 L.Ed.2d 275 (1981); *see also Sanabria v. United States*, 437 U.S. 54, 70 n. 24, 98 S.Ct. 2170, 2182 n. 24, 57 L.Ed.2d 43 (1978) ("Because only a single violation of a single statute is at issue here, we do not analyze this case under the so-called 'same evidence' test, which is frequently used to determine whether a single transaction may give rise to separate prosecutions, convictions, and/or punishments under separate statutes.").

making of any false statement in connection with the acquisition of any firearm or ammunition. The defendant was convicted and sentenced for twice violating this section in one transaction—he lied about his name and his criminal record on the requisite purchase document.[13] *Id.* at 55. We concluded that Congress had not intended for § 922(a)(6) to impose cumulative punishments where a single transaction involved multiple false statements. *Id.* at 59.

Turning first to the wording of subsection (a)(6), we focused on the word "any" in the section's prohibition against "mak[ing] any false or fictitious oral or written statement":

> Other courts, faced with interpretation of similar statutes which, like section 922(a)(6), preface the object of the offense with the word "any," have concluded that no clear intent to impose cumulative punishment has been expressed by Congress. "Seemingly this is because 'any' may be said to fully encompass (*i.e.,* not necessarily exclude any part of) plural activity, and thus fails to unambiguously define the unit of prosecution in singular terms."

*Id.* at 58 (quoting *United States v. Kinsley,* 518 F.2d 665, 667 (8th Cir.1975)) (other citations omitted). Section 922(g)(1) also prefaces the object of the offense with the word "any," stating that it is unlawful for a felon to possess or receive "any firearm or ammunition."

In *Brown,* we next looked to the overall statutory scheme and legislative history of the Gun Control Act and we were "unable to conclude that Congress clearly intended to impose cumulative punishments for a single document that twice violates section 922(a)(6)." *Id.* at 59. Our review of the statutory scheme and legislative history reveals no greater degree of clarity in the context of subsection (g)(1). First, the general statement of purpose and statement concerning penalties are just as silent on the subject of cumulative punishments for violations of (g)(1) as they are for violations of (a)(6). *See* S.Rep. No. 1097, 90th Cong., 2d Sess. (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2113–14, 2207. Furthermore, the state-

ment concerning § 922(f) of the Senate Report, the precursor of § 922(g)(1), is also silent on this subject. *Id.* at 2205.

This silence compels us to reach the same result as we did in Brown: "[W]e cannot say that Congress clearly expressed an intent to impose cumulative punishments upon Brown. Therefore, we are compelled by the rule of lenity to hold that imposition of consecutive sentences ... was error." *Brown,* 623 F.2d at 59. As the Second Circuit has noted in this area: "When Congress wishes to make each act or unit a separate crime it knows how to do so, as it demonstrated in the mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, which specifically define each mailing or transmission as an offense." *United States v. Pelusio,* 725 F.2d 161, 169 (2d Cir. 1983).

Our conclusion is not affected by the fact that § 922(g)(1) appears, on its face, to be concerned with two objectives—preventing felons from possessing firearms and preventing felons from possessing ammunition. In *Brown* we had also concluded that 922(a)(6) was designed to accomplish two distinct purposes-keeping firearms out of the hands of certain individuals and creating a record of gun purchases to aid law enforcement officials. *Brown,* 623 F.2d at 58. We found the presence of twin objectives, without more, insufficient to justify twin punishments:

> [T]he mere existence of these two purposes does not permit us to affirm. We are not allowed to look for an intent that reasonably could be imputed to Congress, nor are we permitted to construe the Act in a way that we believe will best accomplish evident statutory purposes. Rather, when it comes to the imposition of harsh criminal penalties, we must look for "a clear indication that Congress intended to authorize multiple punishments for a single transaction."

*Id.* (quoting *United States v. Clements,* 471 F.2d 1253, 1254 (9th Cir.1972)). As discussed above, this clear indication of intent to

---

**13.** Brown was also convicted of producing a false driver's license to prove identity, but he did

not appeal this conviction. *Brown,* 623 F.2d at 55.

authorize multiple punishments is lacking under § 922(g)(1).

Therefore, upon remand, the government may only seek to convict and sentence Keen for one violation of § 922(g)(1).

## CONCLUSION

Once the district court learned of Keen's desire to proceed *pro se,* it was required to fully inform him in some manner of the nature of the charges against him, the possible penalties, and the dangers of self-representation. The colloquy which took place was inadequate to this task. Therefore, it cannot be said that Keen's waiver of counsel was knowing and intelligent and a new trial must be held.

We further hold that the district court did not err in precluding Keen's use of the insanity defense, as Keen's proffered evidence was insufficient on its face to prove that he was unable to appreciate the nature and quality or the wrongfulness of his actions. The government has conceded that knowledge is an element of all charges brought under 26 U.S.C. § 5861(d), so we trust that an adequate instruction will be given to the jury at the retrial. Under the facts of this case, however, the rule of lenity compels us to conclude that the district court erred when it sentenced Keen twice for simultaneously possessing a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1).

Reversed and remanded.