Filed 6/20/13  P. v. Longorio CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DANIEL LONGORIO,<br><br>        Defendant and Appellant. | A133104<br><br>(San Mateo County<br>Super. Ct. Nos. SC069278A,<br>SC069697A) |

Daniel Longorio was charged with multiple counts of home invasion robbery, burglary, false imprisonment, possession of a firearm by a felon and escape, with allegations of personal use of a firearm, commission of crimes while on parole, and prior convictions and prison terms.  He successfully moved to represent himself at trial, but was less successful in his exercise of that right.  A jury convicted him of all charges and found the allegations true, and the court sentenced Longorio to 198 years to life in prison.  On appeal, Longorio argues his waiver of representation was not knowing and intelligent because the court did not accurately inform him of the maximum penalty he faced or adequately inform him of the nature of the charges against him.  We find no error and affirm, but order a correction in the abstract of judgment.

## I.   BACKGROUND

On May 14, 2009, two armed men entered the home of Quyen and Ken Lau, tied them up, and stole from them property worth approximately $30,000.  On June 24, 2009, Lina Chan's home was burglarized.  Her property was later found in Longorio's home, where police also found a gun.  Longorio admitted his involvement in the Lau robberies

1

and the Chan and other burglaries, and he led police on a tour of the Lau and Chan crime scenes. Longorio's statements during the tour and during other interviews with the police were recorded and ultimately played for the jury at his trial.

On August 11, 2009, while Longorio was being transported to jail following a preliminary hearing on charges arising from the aforementioned events, Longorio opened a van door using a razor blade, ran into the street, and attempted to enter a commuter's car. After he was apprehended and returned to custody, Longorio explained that he was a "three-striker [who] saw a window of opportunity [and] took it."

Two cases were filed against Longorio. In superior court case No. SC069278A, an amended information charged Longorio with two counts of first degree burglary (counts 1, 2; Pen. Code, § 460, subd. (a)),[1] two counts of robbery (counts 3, 4; § 212.5, subd. (a)), two counts of false imprisonment (counts 5, 6; § 236), and one count of possession of a firearm by a felon (count 7; former § 12021, subd. (a)(1)). As to all counts, it was alleged that the crimes were serious or violent felonies committed while Longorio was on parole. (§§ 1203.085, subd. (b), 1192.7, subd. (c).) As to counts two through six, it was alleged Longorio personally used a gun (§§ 12022.5, subd. (a), 1203.06, subd. (a)(1)), and an additional gun enhancement was alleged as to counts three and four (§ 12022.53, subd. (b)). In superior court case No. SC069697A, an amended information charged Longorio with attempted escape (count 1; § 4532, subd. (b)(1)). In both cases, it was also alleged that Longorio had three prior strikes (§ 1170.12, subd. (c)(2)), as well as prior serious felony convictions and prior prison term commitments (§§ 667, subd. (a), 667.5, subd. (b)). The cases were consolidated for trial.

On January 12, 2011, six days before a scheduled trial date, Longorio moved to represent himself at trial pursuant to *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*). The court postponed trial to February 22 and held hearings on the *Faretta* motion on January 19 and February 16. We set forth the *Faretta* colloquy between the court and Longorio in detail.

_____

[1] All statutory references are to the Penal Code unless otherwise indicated.

At the January 19, 2011 hearing, the court (Hon. John L. Grandsaert) began by discussing the maximum penalty Longorio faced:

"THE COURT: . . . [Is the prosecution] prepared to state what Mr. Longorio is facing?

"[PROSECUTOR]: We are proceeding in a three-strikes fashion. It's a— assuming that the two robberies—there's a home invasion robbery, a separate residential burglary and arming allegation, and then, escape charge. So, 25 to life per victim in the robbery, plus a separate residential burglary, plus escape, plus the arming allegation under 12022.53, that alone is 113 years, four months, to life.

"THE COURT: Thank you. [¶] . . . is there anything [defense counsel] wish[es] to add with reference to what the defendant is facing?

"[DEFENSE COUNSEL]: I think those sentencing calculations might be high, but I have not at this point sat down and formally done the research. I know there's a limitation where dealing with three strikes that might lower the minimum term. Life is certainly there. It is a three-strikes case. So, it's going to be some lengthy term. It might be less than 50 to life, but it's going to be over 25 years to life, clearly.

"THE COURT: Okay. Mr. Longorio, are you aware of that?

"THE DEFENDANT: Yes, I am.

"THE COURT: And are you aware of what [defense counsel] is talking about when he talks about the fact that the numbers could be significantly less than what the DA says?

"THE DEFENDANT: I am.

"THE COURT: And you're familiar with the laws that he's talking about? [¶] . . . [¶]

"THE DEFENDANT: Relatively.

"THE COURT: I'm sorry?

"THE DEFENDANT: Yes.

"THE COURT: It's an understatement to say you're facing serious charges.

"THE DEFENDANT: Oh, I am."

3

Later in the colloquy, the court noted that Longorio had not written the maximum penalty on the written waiver form and asked him, "What do you believe is the maximum sentence for the offense?" Longorio responded "What the DA said, about 113 to life."[2]

The court also discussed the charges and enhancement allegations that Longorio was facing:

"THE COURT: Let's talk about these charges. Do you know what you're charged with?

"THE DEFENDANT: Yes.

"THE COURT: What are you charged with?

"THE DEFENDANT: Home invasion robbery, a burglary, another burglary, and escape, and use of a firearm for the home invasion.

"THE COURT: There are some other charges here. Penal Code Section 236. Do you know what that is?

"THE DEFENDANT: No. Not right off the bat.

"THE COURT: Okay. And how about the special allegations under 1203.085(b)? Do you know what that is?

"THE DEFENDANT: Yes. The gun.

"THE COURT: And the 667(a) priors, do you know what those are?

"THE DEFENDANT: Those are priors—prior burglaries or prior convictions.

"THE COURT: Okay. Do you understand the differences between a 12022.5 and a 12022.53 and a 1203.085? I'm not asking you to explain it? I'm asking you if you know the difference.

"THE DEFENDANT: I know the difference between a 1202.5.

"THE COURT: 1202.5?

---

[2] Just before trial commenced in July 2011, Longorio and the prosecutor discussed a possible plea deal with the court. During that discussion, the prosecutor said the maximum sentence on the charged offenses and enhancements was "128 to life. Somewhere in that neighborhood." Longorio said he understood that the maximum sentence if one of his prior "strike" convictions were stricken would be 80 years. The prosecution offered a 42-year stipulated sentence, which Longorio rejected.

4

"THE DEFENDANT: Yeah. 1202.5.

"THE COURT: It's a 12022.5. You know the difference between that and what?

"THE DEFENDANT: And the second one, 1202.5(a).

"THE COURT: It's a .53. These are technical provisions, there's no question about that. [¶] But they have different issues and different elements. Do you know what the elements are for the charges against you? Do you know what the DA has to prove?

"THE DEFENDANT: Yes.

"THE COURT: That's what I mean by elements. What is it that the DA has to prove with regard to a 236, for instance?

"THE DEFENDANT: He has to prove that I committed the crime.

"THE COURT: Sure. And when I ask you what are the elements, it's the elements that the District Attorney has to prove. Your lawyer . . . is very well aware of what the elements are the DA has to prove. How many charges do you have?

"THE DEFENDANT: Five, six, maybe seven.

"THE COURT: That would be in one of the cases. How about in the other one?

"THE DEFENDANT: One or two.

"THE COURT: How many special allegations are against you?

"THE DEFENDANT: Two or three.

"THE COURT: There's a whole lot more than that.

"THE DEFENDANT: Well, I'm just—I'm just saying because of the two robberies and the gun enhancement.

"THE COURT: I understand. But on some of these charges, like for instance, Count 7, a 12021, you're familiar with what that is?

"THE DEFENDANT: I don't have—I left all that at my cell.

"[DEFENSE COUNSEL]: I have the charging documents. Do you want me to provide those to Mr. Longorio?

"THE COURT: I do, but let me carry-on this little bit of conversation first. The 12021(a)(1) is Count 7 against you, and it has the 1203.085, a 1203(e)(4), and of course the strike allegations and the priors follow that last charge. [¶] [Defense counsel] is aware

5

of all of the elements of each of those—of that offense and each of those special allegations. When he's in the middle of questioning a witness, he's going to be questioning them to see if he can get them to show the jury what it is that—what element isn't being met by the DA's case. You can imagine how complicated that is. [¶] Do you think he could do a better job of that than you?

"THE DEFENDANT: I feel I can do it. I've been studying it. I've been going over police reports. I've been going over what the officers said in preliminary.

"THE COURT: How successful have you seen, from your own experience, that people representing themselves have been?

"THE DEFENDANT: About 45-percent chance.

"THE COURT: You think your chances are better with [defense counsel] or by yourself?

"THE DEFENDANT: By myself.

"THE COURT: There's a primary issue with regard to these charges, with regard to the intent. [¶] Do you know whether these crimes with which you're charged have a general intent or a specific intent?

"THE DEFENDANT: Probably specific. And I did them.

"THE COURT: Okay. I can't give you the law school education at this point, but it's a lot more sophisticated than that. Not a question of whether you did it. It's a question of intent. There's a major difference between general intent and specific intent. That's a difference that your attorney is very familiar with. [¶] I can see that it's not something that you're familiar with at this time. [¶] Your trial is February 22nd. It's taken [defense counsel] a career to understand and understand well the kind of intent that the DA has to prove. And he's going to be juggling the various intent requirements and trying to show the holes in the DA case with regard to intent during the time he's questioning each witness. [¶] If the right intent isn't proven, then the charge isn't proven. [¶] Do you understand how complicated that is?

"THE DEFENDANT: It's complicated but doable.

6

"THE COURT: You understand that without knowing the answers to the questions that I'm asking, you're going to be helplessly lost in attempting to identify and prepare possible defenses to these charges? And that's not even talking about objections to the evidence, objections to each question that's being asked by the DA. [¶] You're aware of that?

"THE DEFENDANT: I'm working on my objections right now.

"THE COURT: Who do you think is going to be in a better position to make those objections, you or [defense counsel], by the time trial comes around next month?

"THE DEFENDANT: I'll be ready."

Finally, the court advised Longorio throughout the colloquy about the dangers and disadvantages of self-representation:

"THE COURT: As you know, the attorneys in the Private Defender's Office are extremely well qualified. They're good criminal defense attorneys. They're noted around the country for having an excellent program. And they are highly qualified to conduct these kind of cases. [¶] Do you agree with that?

"THE DEFENDANT: Yes.

"THE COURT: Before I can allow you to represent yourself, you're going to have to convince me that you know what you're doing and that you're capable of doing it. . . . [¶] Can you read and write?

"THE DEFENDANT: Yes, I can.

"THE COURT: How much schooling have you had?

"THE DEFENDANT: I've graduated—I've got my GED.

"THE COURT: Have you ever represented yourself before? [¶] . . . [¶]

"THE DEFENDANT: Not until right now.

"THE COURT: And are you asking that the Court allow you to represent yourself?

"THE DEFENDANT: I am. [¶] . . . [¶]

"THE COURT: Okay. There's a [waiver of counsel] form. It's not too long. It's a page and a half. I'm going to ask my clerk to hand you such a form. I'm going to

7

pause here while you read it. Then, I'm going to be talking to you about it. So, it's very important that you understand every part of it. So, read it carefully.

"THE DEFENDANT: (Reading document.) [¶] . . . [¶]

"THE COURT: And any questions about it?

"THE DEFENDANT: Yes, I do.

"THE COURT: Go ahead. [¶] . . . [¶]

"THE DEFENDANT: About the 6-A, the law provides for numerous pretrial motions available to the defendant which are of a technical nature, the advantage of which I could lose if allowed to represent myself. [¶] My question is: I understand that I have—I have numerous motions that I may need to file and I can file them. But why does it say I would not be allowed—I would lose that right. Why? [¶] . . . [¶]

"THE COURT: . . . This is assuming that these technical nature motions—I don't know whether any of them are applicable to you—that you wouldn't be aware of them because you didn't go to law school. That a very experienced attorney, such as [defense counsel], would be aware of more motions than you're aware of. That's what they're talking about there. Does that make sense?

"THE DEFENDANT: Possible—yes.

"THE COURT: Any other questions?

"THE DEFENDANT: Yes. 6-F. I may waive constitutional, statutory and common law rights unknowingly.

"THE COURT: What that means is lawyers are aware—defense lawyers are away [*sic*] of times when you could say something or do something that would affect your rights. They're just dangerous traps, if you will. And if you unknowingly step into one of those traps, you could lose a right that you didn't know you were losing. That's what they're talking about. It's, again, a matter of law school knowledge, a matter of criminal law experience, and it's the fact that you're going up against an experienced criminal attorney in the prosecutor. [¶] . . . [¶]

"THE DEFENDANT: Okay. [¶] . . . [¶]

8

"THE COURT: Apart from the questions that you asked me, you believe that you understand [the form]?

"THE DEFENDANT: I do."

The court reviewed specific constitutional rights with Longorio, including the right to counsel, to a speedy trial, to confrontation and cross-examination, to testify and to refuse to testify, and to present defense evidence. The court then continued:

"THE COURT: And you understand you'll be up against an experienced prosecuting attorney who will try your case, and that neither he nor the Court will assist you or otherwise provide special treatment to you?

"THE DEFENDANT: I'm aware of that.

"THE COURT: You understand you'll have to follow all the technical rules of substantive law, criminal procedures and evidence, just as a lawyer must?

"THE DEFENDANT: Yes.

"THE COURT: You understand that you will not receive any more library privileges than those available to any other person representing himself? [¶] Do you understand that you will not receive any more library privileges—[¶] . . . [¶] . . . —than those made available to any other person representing himself?

"THE DEFENDANT: Yes.

"THE COURT: Do you understand you will not receive any extra time to prepare your case for motions or for trial?

"THE DEFENDANT: I understand that.

"THE COURT: You understand that a special investigator will not be assigned to your case unless you can demonstrate to the Court that the services of an investigator are necessary to the preparation of your case? Do you understand that?

"THE DEFENDANT: I do.

"THE COURT: Do you understand that depending on the stage of the proceedings, should you decide that you no longer want to represent yourself, the Court may deny you the opportunity to change your mind and have a lawyer appointed again? Do you understand that?

"THE DEFENDANT:  I do.

"THE COURT:  The right to act as your own lawyer is not a license to abuse the dignity of the Court.  If the Court determines that you are doing that by engaging in deliberate misbehavior that is causing disruption in the trial proceedings, the Court will terminate your right to self-representation.  Do you understand that?

"THE DEFENDANT:  I do.

"THE COURT:  Suppose that would happen.  Do you understand how difficult it would be for a lawyer to be appointed in the middle of your trial and be able to assist you effectively?

"THE DEFENDANT:  Very.

"THE COURT:  Do you still want to represent yourself?

"THE DEFENDANT:  I do. [¶] . . . [¶]

"THE COURT:  The three phases of your case are pretrial, trial, and then if there is a conviction, proceedings after conviction. [¶] With regard to the proceedings before trial —that's the stage you're in—there are . . . potential motions, only [defense counsel] at this point knows which ones would be a good idea to bring—motions for dismissal, motions for disqualification of a judge, severance of counts, discovery.  He's already done a motion to suppress, I see. [¶] Those are just some of those technical motions that the form is talking about.  He's in a position to know what motions to bring between now and the trial date.  He knows how to make those motions and knows when they have to be ready. [¶] You're not familiar with those things, at least as to some of those motions. [¶] So, you still want to represent yourself?

"THE DEFENDANT:  I do.

"THE COURT:  You know at the trial that you're going to have to ask proper questions on voir dire with regard to the jury.  You have to know when and how to exercise challenges, both for cause and peremptory challenges.  You have to know how many of each type of challenge you're entitled to.  And the Judge isn't going to help you. [¶] Are you aware of that?

"THE DEFENDANT:  I am.

10

"THE COURT: Do you understand that damaging evidence, such as hearsay evidence, may be admitted against you during the trial unless you know what you're doing—

"THE DEFENDANT: Yes.

"THE COURT: —and you've made the proper objections?

"THE DEFENDANT: I do.

"THE COURT: Do you know what the exceptions are to the hearsay rule?

"THE DEFENDANT: I'm studying up on it right now.

"THE COURT: You understand you're going to have to deal with problems like these priors, the admissibility of evidence of uncharged crimes, the use of prior convictions to impeach witnesses, and that if you don't make timely objections, you don't make the objections at the right time, if you don't make the proper objections, there are— there is evidence that's going to come into the case that would hurt your case? [¶] Do you understand that?

"THE DEFENDANT: I do.

"THE COURT: You understand if you don't question a witness right, that objections will be sustained, and you may not know why?

"THE DEFENDANT: If I object, yeah.

"THE COURT: I'm talking about if you ask a question, the DA objects, and the Judge says sustained—

"THE DEFENDANT: Then I'll reform the question.

"THE COURT: Do you understand that you may not be in a position, based on your legal knowledge, to reframe the question in a way that's going to be allowed by the Judge? Then you have a situation where you want information out of the witness but you won't be able to get that information out. And the jury won't hear about it, because these are some of the technical rules. This is why lawyers go to law school. This is why lawyers gain their experience before taking on serious cases like this. [¶] Do you understand that?

"THE DEFENDANT: I do.

11

"THE COURT:  Do you understand how dangerous that could be to your case?

"THE DEFENDANT:  I do.

"THE COURT:  And you still want to act as your own lawyer?

"THE DEFENDANT:  Yes, Your Honor.

"THE COURT:  Let's suppose just for a moment that you are convicted.  One of the grounds for appealing a conviction is the kind of defense a defendant received.  If a lawyer does a poor job of representing a defendant that can be claimed to be— [¶] . . . [¶] . . . ineffective assistance of counsel.  And the case can be reversed on appeal.  If you insist on representing yourself, you'll give up that right. [¶] Do you understand that?

"THE DEFENDANT:  I do."

After this extensive colloquy, defense counsel reminded the court that he had filed a motion to continue the trial to afford him an opportunity to investigate Longorio's mental health.  In a declaration attached to the motion, counsel had explained that Longorio "had given me no reason to believe he was mentally ill, or had a history of any mental illness" and had expressed no desire to plead not guilty by reason of insanity or to claim incompetence to stand trial.  Nevertheless, counsel had learned that Longorio was placed on psychotropic medication while incarcerated at Pelican Bay prison.  Because the case was a three strikes case with a potential sentence in excess of 100 years to life, and in an abundance of caution, counsel wanted to investigate the mental health issue further, specifically by obtaining Longorio's medical records from the prison system.  At the January 19, 2011 hearing, it was further disclosed that Longorio's mother was schizophrenic.  The prosecutor did not oppose the motion.  Although the court commented that it had seen no evidence that Longorio was incompetent, it agreed the additional information should be obtained.  The court continued the trial and denied the *Faretta* motion without prejudice.

On February 15, 2011, Longorio renewed his *Faretta* motion and a hearing on the matter was held the following day.  Defense counsel reported that he had obtained and reviewed Longorio's medical records and had a psychiatrist review the records and

interview Longorio. "There are no mental health defenses that I can offer in this particular case. And I do feel Mr. Longorio to be competent as his doctor told him."

Moving on to the *Faretta* issue, the court conducted the following additional colloquy:

"THE COURT: . . . Mr. Longorio, have you thought about what we talked about last time?

"THE DEFENDANT: Yes, I have, your Honor.

"THE COURT: And do any of those things that we talked about cause you to be concerned about your chances of prevailing at trial if you represent yourself?

"THE DEFENDANT: No.

"THE COURT: I gathered from what you said . . . that you recognized that there was a—that defendants who represent themselves have a—I think, didn't you say a 40 or 45 percent chance?

"THE DEFENDANT: 55.

"THE COURT: 55. [¶] And what do you assess the chances to be if you're represented by counsel?

"THE DEFENDANT: 45. 50.

"THE COURT: So you believe that you have a better opportunity to prevail at trial without counsel?

"THE DEFENDANT: I do.

"THE COURT: Even after we talked about all the things that you don't know about the charges?

"THE DEFENDANT: Yes, I do.

"THE COURT: And there's one more subject that we should talk about. And that is based on the fact that you have an escape that you're charged with, a trial judge may restrict your movements in the courtroom in a major way. Do you understand that?

"THE DEFENDANT: I do.

"THE COURT: If you're represented by counsel, counsel would not be restricted from . . . movement about the courtroom. And I imagine you can see that that would be

13

an advantage in having an attorney because they'd be able to move freely about the courtroom and you might not be able to. [¶] Do you agree that that might be an advantage?

"THE DEFENDANT:  No.

"THE COURT:  Do you think it might be a disadvantage to, for instance, represent yourself and make all your comments to the jury from a seated position at counsel table instead of standing in front of the jury and making a presentation?

"THE DEFENDANT:  It may.  But if I'm standing in front of the jury cuffed up, it's going to be the same thing.  So either/or.

"THE COURT:  What I'm saying to you is some trial judge might find—I'm not saying he will—but he might find you're not allowed to move about the courtroom.  As a matter of fact, he might find that you have to stay seated in your chair when you do anything during the trial to represent yourself.  That would not be true of [defense counsel] if he were to represent you.  That's what I'm saying.  So in knowing that, does that make you question your decision to represent yourself?

"THE DEFENDANT:  No, it does not. [¶] . . . [¶]

"THE COURT:  Okay. [¶] So understanding that your movements could be restricted, that you might have to address the jury from a seated position at counsel table whereas the prosecution may instead be able to move about the courtroom, do you still wish to represent yourself?

"THE DEFENDANT:  I do."

The court specifically found Longorio was competent to represent himself, granted his motion to represent himself, appointed his former attorney as standby counsel, and granted a continuance of trial.

Longorio represented himself throughout the trial.  The jury found Longorio guilty as charged and found the enhancement allegations true.  The trial court imposed state prison for a total of 198 years to life.

14

## II. DISCUSSION

"A criminal defendant has a right to represent himself at trial under the Sixth Amendment to the United States Constitution. (*Faretta*[*, supra,*] 422 U.S. 806 . . . ; *People v. Marshall* (1997) 15 Cal.4th 1, 20 (*Marshall*).) A trial court must grant a defendant's request for self-representation if three conditions are met. First, the defendant must be mentally competent, and must make his request knowingly and intelligently, having been apprised of the dangers of self-representation. (*Faretta, supra,* at p. 835; *People v. Gallego* (1990) 52 Cal.3d 115, 161; *People v. Bloom* (1989) 48 Cal.3d 1194, 1224–1225.) Second, he must make his request unequivocally. (*Faretta, supra,* at p. 835; *People v. Clark* (1992) 3 Cal.4th 41, 98 (*Clark*).) Third, he must make his request within a reasonable time before trial. (*Marshall, supra,* at pp. 20–21; *Clark, supra,* at p. 98; *People v. Windham* (1977) 19 Cal.3d 121, 128.)" (*People v. Welch* (1999) 20 Cal.4th 701, 729, parallel citations omitted.)

Longorio argues his waiver of representation was not knowing and intelligent because the trial court failed to advise him of the maximum penalty he faced at trial or to explain the nature of the charges and enhancement allegations he faced at trial.

Whether there has been a waiver is a question of fact, and the burden is on the defendant to demonstrate he did not knowingly and intelligently waive his right to counsel. (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 547 (*Sullivan*).) On appeal, the courts "review the entire record—including proceedings after the purported invocation of the right of self-representation—and determine de novo whether the defendant's invocation was knowing and voluntary. [Citations.] Even when the trial court has failed to conduct a full and complete inquiry regarding a defendant's assertion of the right of self-representation, these courts examine the entire record to determine whether the invocation of the right of self-representation and waiver of the right to counsel was knowing and voluntary. [Citations.]" (*Marshall, supra,* 15 Cal.4th at p. 24.)

We disagree with Longorio's view of the legal standard for a *Faretta* inquiry and our review of the record confirms that the trial court's colloquy here was constitutionally adequate.

15

A.    *Required Scope of a* Faretta *Colloquy*

A defendant seeking to represent himself at trial " 'should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open." [Citation].' (*Faretta, supra,* 422 U.S. at p. 835.)" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1070 (*Koontz*), parallel citation omitted.)  Shortly after *Faretta* was decided, a California Court of Appeal provided suggestions about the scope of the inquiry to be made by the court when a defendant "chooses to go it alone." (*People v. Lopez* (1977) 71 Cal.App.3d 568, 571–574 (*Lopez*).)  Noting that "the trial judge must recognize that the first ground on appeal is probably going to be that the defendant was allowed to represent himself without having intelligently and voluntarily made that decision" (*id*. at p. 572), the court suggested that advisements should (1) explain the dangers and disadvantages of self-representation, (2) inquire into the defendant's mental capacity, and (3) advise the defendant that he cannot later claim ineffective assistance of counsel.  (*Id.* at pp. 572–574.)  With respect to the second factor, the *Lopez* court wrote, "Perhaps some exploration into the nature of the proceedings, the possible outcome, possible defenses and possible punishments might be in order." (*Id.* at p. 573.)  The Supreme Court has cited *Lopez* favorably, but clarified that "[n]o particular form of words is required in admonishing a defendant who seeks to waive counsel and elect self-representation; the test is whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case. [Citation.]" (*Koontz*, at p. 1070.)  In *Koontz*, the Supreme Court rejected an argument that a trial court's *Faretta* colloquy was inadequate because it did not include some specific advisements suggested by *Lopez.* (*Koontz*, at pp. 1070–1073.)  The court concluded the allegedly missing advisements were implicit in other parts of the colloquy and the colloquy as a whole was constitutionally adequate. (*Id.* at pp. 1072–1073; see also *People v. Lawley* (2002) 27 Cal.4th 102, 142 [as whole, colloquy was adequate in light of *Lopez*].)

The United States Court of Appeals for the Ninth Circuit has formulated a standard for *Faretta* colloquies that requires district courts to ensure the defendant understands "1) the nature of the charges against him, 2) the possible penalties, and 3) the 'dangers and disadvantages of self-representation.' [Citation.]" (*United States v. Erskine* (9th Cir. 2004) 355 F.3d 1161, 1167 (*Erskine*).)[3] In *Erskine*, the Ninth Circuit reversed a criminal judgment on the ground that, although the defendant was properly advised on the dangers and disadvantages of self-representation, he was erroneously advised that the maximum prison sentence he faced was one year; the actual maximum penalty was five years. (*Id.* at pp. 1165, 1169–1171; see also *United States v. Forrester* (9th Cir. 2008) 512 F.3d 500, 507 (*Forrester*) [reversing, despite proper advisement on dangers and disadvantages of self-representation, because defendant not advised of nature of charge against him and erroneously advised about penalty (told maximum sentence was 10 years to life, whereas sentencing range was 0–20 years].) In *Sullivan*, another division of this court cited the Ninth Circuit standard for *Faretta* colloquies as if it were controlling law in California. (*Sullivan, supra,* 151 Cal.App.4th at p. 545.) But the *Sullivan* court also reiterated the rule that " ' " '[t]he test of a valid waiver of counsel is not whether specific warnings or advisements were given but whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case.' " [Citations.]' [Citation.]" (*Id.* at p. 546.) And, the court affirmed on the ground that the defendant had not provided a sufficient record to demonstrate that that his waiver of his right to counsel was *not* knowing and voluntary.

---

[3] The Ninth Circuit standard dates back to a pre-*Faretta* decision, *United States v. Dujanovic* (1973) 486 F.2d 182, 186 ("[w]e cannot visualize a less minimal requirement than the District Court shall not grant a request to waive counsel and proceed pro se without addressing the accused personally and determining on the record that the demand to waive counsel and proceed pro se is competently and intelligently made with understanding of the nature of the charge and the penalties involved" (italics omitted)). (See *Erskine, supra,* 355 F.3d at p. 1167; *United States v. Balough* (1987) 820 F.2d 1485, 1487; *United States v. Rylander* (1983) 714 F.2d 996, 1005; *United States v. Harris* (1982) 683 F.2d 322, 324.)

(*Id.* at pp. 548–549.)  Any difference between the Ninth Circuit and California Supreme Court standards was immaterial to the court's decision.

Citing *Erskine, supra,* 355 F.3d 1161 and *Sullivan, supra,* 151 Cal.App.4th 524, Longorio argues the trial court erred by failing to *explain* the charges and enhancement allegations he was facing during the colloquy.  Although the court discussed the charges and enhancement allegations during the colloquy, Longorio argues the court erred by merely demonstrating to Longorio that he did not fully understand those charges and enhancements and not ensuring that Longorio understood them.  We disagree.  Under United States and California Supreme Court law, the trial court's duty during the *Faretta* colloquy was to explain "the disadvantages of self-representation, including the risks and complexities of the particular case."  (*Koontz, supra,* 27 Cal.4th at p. 1070.)  We agree that discussion of charges (and enhancement allegations) made against the defendant, as well as of maximum penalties he faces, may be a critical component of explaining the dangers and disadvantages of self-representation *in a particular case*.  (See, e.g., *People v. Noriega* (1997) 59 Cal.App.4th 311, 319 [colloquy inadequate in part because "[t]he court did not inquire whether appellant understood the charges against him and the potential penal consequences if he lost at trial"].)  However, we do not agree that, as Longorio suggests, the court is required to provide the defendant with a sentencing matrix on multiple charges, to precisely state the maximum penalty, or to provide a tutorial on the elements of each charge or enhancement.[4]  The inquiry, based on the entire record, is only whether a defendant actually understands "the significance and consequences" of his decision.  (*People v. Welch, supra,* 20 Cal.4th at pp. 733–734.)  The court's duty during the colloquy is to determine whether the defendant is operating under a misapprehension about the charges or penalties and to alert him to the possible complexity of the charges or sentencing issues so that, if he chooses to waive his right to counsel, he does so " 'with eyes open.' "  (*Faretta, supra,* 422 U.S. at p. 835.)  "If the trial court's warnings

_____

[4] We do not suggest that the Ninth Circuit necessarily applies such a standard.

18

communicate powerfully to the defendant the 'disadvantages of proceeding pro se,' that is all '*Faretta* requires.' [Citation.]" (*Sullivan, supra*, 151 Cal.App.4th at p. 546.)

B.        *Adequacy of the* Faretta *Colloquy in Longorio's Case*

As a preliminary matter, we note that Longorio raises no issue on appeal as to his mental competence to waive counsel. His mental competence was thoroughly investigated and both his appointed counsel and the court stated on the record they had no concerns in that regard.[5]

The *Faretta* colloquy conducted by the court was cautious and extensive. The court made sure Longorio was not acting under a misapprehension of the seriousness of the charges and enhancement allegations he was facing or the severity of penalty that could be imposed. The court explained constitutional rights Longorio was waiving or might inadvertently waive through his untutored defense of the charges against him. The court extensively described the dangers and disadvantages of self-representation both generally and in the particular circumstances of Longorio's case: the superior skill and experience of the prosecutor; the potential, due to Longorio's ignorance of criminal law or procedure, for inadvertent forfeiture of objections, overlooked motions for relief before, during and after trial, and an inability to introduce admissible evidence due to ignorance of procedural requirements; and possible restrictions on Longorio's movement

---

[5] The minimum federal constitutional standard of competence for a defendant to waive his right to counsel is the competence to stand trial. (*Godinez v. Moran* (1993) 509 U.S. 389, 399–400.) However, states are free to require a higher level of competency for self-representation at trial (*Indiana v. Edwards* (2008) 554 U.S. 164, 174) and the California Supreme Court has granted superior courts the discretion to impose that higher standard (*People v. Johnson* (2012) 53 Cal.4th 519, 528). Specifically, superior courts may deny *Faretta* requests if the defendant, although competent to stand trial, "suffers from a severe mental illness to the point where he or she cannot carry out the basic tasks needed to present the defense without the help of counsel." (*People v. Johnson,* at p. 530.) Courts "must apply this standard cautiously. . . . A court may not deny self-representation merely because it believes the matter could be tried more efficiently, or even more fairly, with attorneys on both sides." (*Id.* at p. 531.) If the defendant meets the higher standard of competence and the other requirements for a successful *Faretta* motion are satisfied, the court must allow the defendant to represent himself at trial.

in the courtroom. The court explained that Longorio would not be able to change his mind and seek representation midway through the trial, and explained that he would not be able to appeal a conviction on the ground of denial of counsel or ineffective assistance of counsel.

1.    *Penalty*

During the *Faretta* colloquy, the prosecutor stated that the maximum sentence on three of the charges and one enhancement—the two-victim robbery, the residential burglary, the escape, and the arming allegation—*alone* was 113 years and four months to life. Defense counsel suggested that the maximum might be lower, but explained that he had not yet researched the matter. Longorio told the court he understood the maximum sentence was 113 to life. The ultimate sentence imposed, however, was 198 years to life.

Failure to specifically advise Longorio that the maximum penalty he faced was 198 years to life, rather than *at least* 113 years to life, does not establish error. And unlike the Ninth Circuit cases Longorio cites in support of his argument, the trial court did not misadvise Longorio that he would only be subject to a substantially lesser penalty. In *Erskine*, the defendant was told the maximum penalty was one year, whereas it was in fact five years. (*Erskine, supra,* 355 F.3d at pp. 1165, 1169–1171.) The five-fold difference in penalty was clearly sufficient to render the waiver not knowing or voluntary and to prevent the conclusion that the defendant acted with his eyes wide open when he chose self-representation. In *Forrester*, the defendant was told the maximum was 10 years to life, whereas the maximum term was 20 years. (*Forrester, supra,* 512 F.3d p. 507.) The erroneous information misled the defendant about the maximum as to both the determinate and indeterminate parts of the sentence, which could have led the defendant to mistakenly overestimate (possible life component of sentence) or underestimate (10 versus 20 year maximum determinate sentence) the risks he was facing at trial, again precluding a finding that the defendant waived his right to counsel with his eyes wide open.

As explained *ante*, the purpose of advising the defendant of the penalty he faces is not to provide the defendant with a precise sentencing maximum or range or to tutor the

20

defendant in the subtleties of applicable sentencing law. Rather, the purpose is to adequately apprise the defendant of the dangers and disadvantages of self-representation in the particular circumstances of the case. Here, Longorio had an extensive criminal and institutional history, and was a self-described "three-striker." He acknowledged that he faced a potential sentence far in excess of his life expectancy. The record is quite clear that Longorio was persistent, insistent and unequivocal in asserting his right to self-representation despite clear and repeated warnings from the court that it was highly inadvisable to do so. He makes no showing on appeal that knowledge that the maximum penalty would be 198 years to life rather than 113 years to life would have materially affected his decision to choose self-representation. It is his burden to do so, and Longorio fails to demonstrate otherwise.

2. *Nature of the Charges*

Longorio's second complaint is that the court "failed to ensure that he understood the nature of the charges." He acknowledges that the court reviewed the charges and the enhancement allegations with Longorio, but complains that the court "did not do so to educate him, but to impress upon him his ignorance." Again, the purpose of the *Faretta* inquiry is not to tutor the defendant on the nature of the charges and allegations brought against him, but to ensure that he understands the dangers and disadvantages of self-representation in the particular circumstances of his case. The court effectively articulated the number of charges and enhancements Longorio faced, disabusing Longorio of the notion that the case was limited to "[h]ome invasion robbery, a burglary, another burglary, and escape, and use of a firearm for the home invasion." The court also alerted Longorio to the fact that the multiple charges and enhancement allegations required different forms of proof and thus were potentially subject to different defenses, and that holding the prosecution to its burden of proof as to certain elements, such as specific intent, required a high level of legal understanding. *Forrester*, cited by Longorio in support of his argument, is distinguishable. There, the court faulted the *Faretta* colloquy because there was "no mention of the conspiracy charge in the hearing transcript, let alone any indication that the court sought to ensure that Forrester

21

understood the charge and grasped that conspiracy is a particularly complex and confusing allegation to defend against." (*Forrester, supra,* 512 F.3d at p. 507.) Here, the court ensured that Longorio was aware of the multiple charges and enhancements that were brought against him, and that he grasped that certain legal issues involved in the myriad charges would be complex and confusing for a lay person to defend against. The court was not required to do more.

One may well question whether a decision to elect self-representation is ever "intelligent," in the sense that it is invariably unwise. But, the record before us amply demonstrates that Longorio was made well aware of the risks and dangers in representing himself, and that he voluntarily elected to do so " 'with eyes open.' " (*Faretta, supra*, 422 U.S. at p. 835; *People v. Stanley* (2006) 39 Cal.4th 913, 932.) He therefore cannot now complain of the consequences of that choice.

C.      *Correction to Abstract of Judgment*

Both parties agree that the abstract of judgment erroneously states that section 12022.53, subdivision (b) gun enhancements were imposed but stayed as to counts 1, 2, 5, and 6 in case No. SC069278A. In fact, the section 12022.53, subdivision (b) enhancement was alleged only as to counts 3 and 4 in case No. SC069278A. The jury found true section 12022.53, subdivision (a) enhancement as to counts 3 and 4, and found true section 12022.5, subdivision (a) enhancements as to counts 2, 3, 4, 5, and 6 in that case. The abstract also erroneously states that a section 12022.53, subdivision (b) enhancement was imposed but stayed as to count 1 in case No. SC069697A. Additionally, the abstract of judgment does not reflect that the jury found true an enhancement under section 1203.085, subdivision (b) for all counts in case No. SC069278A. Therefore, we shall order the superior court clerk to correct the abstract of judgment to conform with the verdict of the jury.

22

### III. DISPOSITION

The judgment is affirmed. The superior court clerk shall prepare an amended abstract of judgment in conformity with the jury's verdict and forward the amended abstract to the Department of Corrections and Rehabilitation.

_____

Bruiniers, J.

We concur:

_____

Jones, P. J.

_____

Needham, J.