DIANA GRIBBON MOTZ, Circuit Judge,
dissenting in part and concurring in the judgment:
I concur in the judgment affirming Defendants’ convictions and sentences. But, with respect, I dissent from the holding that the government violated Defendants’ Fourth Amendment rights. The majority concludes that the government did so when it obtained, pursuant to 18 U.S.C. § 2703(d) court orders, but without warrants, records of the cell phone towers Defendants used to make and receive calls and text messages. That holding flies in the face of the Supreme Court’s well-established third-party doctrine.[1]
The Court has long held that an individual enjoys, “no legitimate expectation of privacy,” and so no Fourth Amendment protection, in information he “voluntarily turns over to [a] third part[y].” Smith v. Maryland, 442 U.S. 735, 743-44, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979). This rule applies even when “the information is revealed,” as it assertedly was here, “on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.” United States v. Miller, 425 U.S. 435, 443, *379 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976). Accordingly, the government’s acquisition of historical cell site location information (CSLI) from Defendants’ cell phone provider did not implicate, much less violate, the Fourth Amendment.
I.
The Fourth Amendment ensures that “[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.” U.S. Const, amend. IV. Broadly, “a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable.” Kyllo v. United States, 533 U.S. 27, 33, 121 S.Ct, 2038, 150 L.Ed.2d 94 (2001).
In assessing whether such a search occurred, “it is important to begin by specifying precisely the nature of the state activity that is challenged.” Smith, 442 U.S. at 741, 99 S.Ct. 2577 (emphasis added). Here, that “activity” is the government’s acquisition from a phone company, Sprint/Nextel, of CSLI records — i.e., the records the phone company created that identify which cell towers it used to route Defendants’ calls and messages. The government did not surreptitiously view, listen to, record, or in any other way engage in direct surveillance of Defendants to obtain this information. Rather, it was SprinVNextel alone that obtained the information, and generated the business records, that Defendants now claim are constitutionally protected.
The nature of the governmental activity here thus critically distinguishes this case from those on which the majority relies— cases in which the government did surreptitiously collect private information.[2] In United States v. Karo, 468 U.S. 705, 714-15, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984), for instance, the Drug Enforcement Agency placed a beeper within a can of ether and received tracking information from the beeper while the can was inside a private residence. Similarly, in Kyllo, 533 U.S. at 34-35, 121 S.Ct. 2038, the Department of the Interior used a thermal imager to gather “information regarding the interior of the home.” And in United States v. Jones, — U.S.-, 132 S.Ct. 945, 949, 181 L.Ed.2d 911 (2012), the FBI and local law enforcement secretly installed a GPS tracking device on a suspect’s vehicle and monitored the vehicle’s movements for four weeks.
On the basis of these cases, the majority contends that “the government invades a reasonable expectation of privacy when it relies upon technology not in general use to discover the movements of an individual over an extended period of time.” Per *380 haps. But that question is not before us. The question we must answer is not whether, in the abstract, an individual has a reasonable expectation of privacy in' his location and movements over time. Rather, the question before us is whether an individual has a reasonable expectation of privacy in a third party’s records that permit the government to deduce this information. Karo, Kyllo, and Jones, all of which involve direct government surveillance, tell us nothing about the answer to that question.
Instead, the cases that establish the third-party doctrine provide the answer. Under the third-party doctrine, an individual can claim “no legitimate expectation of privacy” in information that he has voluntarily turned over to a third party. Smith, 442 U.S. at 743-44, 99 S.Ct. 2577. The Supreme Court has reasoned that, by “revealing his affairs to another,” an individual “takes the risk ... that the information will be conveyed by that person to the Government.” Miller, 425 U.S. at 443, 96 S.Ct. 1619. The Fourth Amendment does not protect information voluntarily disclosed to a third party because even a subjective expectation of privacy in such information is “not one that society is prepared to recognize as ‘reasonable.’ ” Smith, 442 U.S. at 743, 99 S.Ct. 2577 (internal quotation marks and citation omitted). The government therefore does not engage in a Fourth Amendment “search” when it acquires such information from a third party.
Applying the third-party doctrine to the facts of this case, I would hold that Defendants did not have a reasonable expectation of privacy in the CSLI recorded by Sprint/Nextel. The Supreme Court’s reasoning in Smith controls. There, the defendant challenged the government’s use of a pen register — a device that could record the outgoing phone numbers dialed from his home telephone. Id. at 737, 99 S.Ct. 2577. The Court held that the defendant could “claim no legitimate expectation of privacy” in the numbers he had dialed because he had “voluntarily conveyed” those numbers to the phone company by “‘expos[ing]’ that information to” the phone company’s “equipment in the ordinary course of business.” Id. at 744, 99 S.Ct. 2577. The defendant thereby “assumed the risk that the company would reveal to police the numbers he dialed.” Id.
Here, as in Smith, Defendants unquestionably “exposed” the information at issue to the phone company’s “equipment in the ordinary course of business.” Id. Each time Defendants made or received a call, or sent or received a text message- — activities well within the “ordinary course” of cell phone ownership — Sprint/Nextel generated a record of the cell towers used. The CSLI that Sprint/Nexel recorded was necessary to route Defendants’ cell phone calls and texts, just as the dialed numbers recorded by the pen register in Smith were necessary to route the defendant’s landline calls. Having “exposed” the CSLI to Sprint/Nextel, Defendants here, like the defendant in Smith, “assumed the risk” that the phone company would disclose their information to the government. Id. at 744, 99 S.Ct. 2577. For these reasons, the government’s acquisition of that information (historical CSLI) pursuant to § 2703(d) orders, rather than warrants, did not violate the Fourth Amendment.
Three other federal appellate courts have considered the Fourth Amendment question before us. Not one has adopted the majority’s holding. Two of our sister courts have expressly held, as I would, that individuals do not have a reasonable expectation of privacy in historical CSLI records that the government obtains from cell phone service providers through a § 2703(d) order. See United States v. Davis, 785 F.3d 498, 511 (11th Cir.2015) *381 (en banc) (holding defendant had no “objective[ly] reasonable expectation of privacy in MetroPCS’s business records showing the cell tower locations that wirelessly connected his calls”); In re Application of U.S. for Historical Cell Site Data, 724 F.3d 600, 615 (5th Cir.2013) (In re Application (Fifth Circuit)) (holding the government can use “[s]ection 2703(d) orders to obtain historical cell site information” without implicating the Fourth Amendment (emphasis omitted)). And although the third court opined that “[a] cell phone customer has not ‘voluntarily’ shared his location information with a cellular provider in any meaningful way,” it held that “CSLI from cell phone calls is obtainable under a § 2703(d) order,” which “does not require the traditional probable cause determination” necessary for a warrant. In re Application of U.S. for an Order Directing a Provider of Elec. Commc’n Serv. to Disclose Records to Gov’t, 620 F.3d 304, 313, 317 (3d Cir.2010) (In re Application (Third Circuit)).
Even in the absence of binding circuit precedent, the vast majority of federal district court judges have reached the same conclusion.[3] Given this near unanimity of federal authority, the majority is forced to rest its holding on three inapposite state cases and three district court opinions— including one that has been vacated, In re Application of U.S. for Historical Cell Site Data, 747 F.Supp.2d 827 (S.D.Tex.2010), vacated, 724 F.3d 600 (5th Cir.2013), and another that involves only prospective and real-time CSLI, In re Application of U.S. for an Order Authorizing Disclosure of Location Info, of a Specified Wireless Tel., 849 F.Supp.2d 526, 535 & n. 4 (D.Md. 2011).[4]
*382 In sum, the majority’s holding-lacks support from all relevant authority and places us in conflict with the Supreme Court and three other federal appellate courts.
II.
Despite the lack.of support for its position, the majority insists that the third-party doctrine does not apply here. The majority maintains that “a cell phone user does not ‘convey’ CSLI to her service provider at all — voluntarily or otherwise — and therefore does not assume any risk of disclosure to law enforcement.” This is the analytical lynchpin of my colleagues’ holding.[5] By my count, they invoke a cell phone user’s asserted lack of “voluntariness” no less than twenty times in their discussion of the third-party doctrine. But my colleagues’ holding that cell phone users do not voluntarily convey CSLI misapprehends the nature of CSLI, attempts to redefine the third-party doctrine, and rests on a long-rejected factual argument and the constitutional protection afforded a communication’s content.
A.
With respect to the nature of CSLI, there can be little question that cell phone users “convey” CSLI to their service providers. After all, if they do not, then who does? Perhaps the majority believes that because a service provider generates a record of -CSLI, the provider just conveys CSLI to itself. But before the provider can create such a record, it must receive information indicating that a cell phone user is relying on a particular cell tower. The provider only receives that information when a cell phone user’s phone exchanges signals with the nearest available cell tower. A cell phone user therefore “conveys” the location of the cell towers his phone connects with whenever he uses the provider’s network.
There is similarly little question that cell phone users convey CSLI to their service providers “voluntarily.” See Davis, 785 F.3d at 512 n. 12 (“Cell phone users voluntarily convey cell tower location information to telephone companies in the course of making and receiving calls on their cell phones.”). This is so, as the Fifth Circuit explained, even though a cell phone user “does not directly inform his service provider of the location of the nearest cell phone tower.” In re Application (Fifth Circuit), 724 F.3d at 614.
Logic compels this conclusion. When an individual purchases a cell phone and chooses a service provider, he expects the provider will, at a minimum, place outgo *383 ing calls, send text messages, and route incoming calls and messages. As most cell phone users know all too well, however, proximity to a cell tower is necessary to complete these tasks. Anyone who has stepped outside to “get a signal,” or has warned a caller of a potential loss of service before entering an elevator, understands, on some level, that location matters. See id. at 613 (“Cell phone users recognize that, if their phone cannot pick up a signal (or ‘has no bars’), they are out of the range of their service provider’s network of towers.”).
A cell phone user thus voluntarily enters an arrangement with his service provider in which he knows that he must maintain proximity to the provider’s cell towers in order for his phone to function. Whenever he expects his phone to work, he is thus permitting — indeed, requesting — his service provider to establish a connection between his phone and a nearby cell tower. A cell phone user therefore voluntarily conveys the information necessary for his service provider to identify the CSLI for his calls and texts. And whether the service provider actually “elects to make a ... record” of this information “does not ... make any constitutional difference.” Smith, 442 U.S. at 745, 99 S.Ct. 2577.
To be sure, some cell phone users may not recognize, in the moment, that they are “conveying” CSLI to their service provider. See In re Application (Third Circuit), 620 F.3d at 317. But the Supreme Court’s use of the word “voluntarily” in Smith and Miller does not require contemporaneous recognition of every detail an individual conveys to a third party.[6] Rather, these cases make clear that the third-party doctrine does not apply when an individual ¿«voluntarily conveys information' — as when the government conducts surreptitious surveillance or when a third party steals private information.
Thus, this would be a different case if SprinVNextel had misused its access to Defendants’ phones and secretly recorded, at the government’s behest, information unnecessary to the provision of cell service. Defendants did not assume that risk when they made calls or sent messages. But like the defendant in Smith, 442 U.S. at 747, 99 S.Ct. 2577, Defendants here did “assume the risk” that the phone company would make a record of the information necessary to accomplish the very tasks they paid the phone company to perform. They cannot now protest that providing this essential information was involuntary.
B.
To justify its rejection of the third-party doctrine, the majority attempts to redefine it. The majority maintains that the third-party doctrine does not apply to CSLI because a cell phone user need not “actively submit any location-identifying information when making a call or sending a message.” My colleagues apparently believe that an individual only “voluntarily convey[s]” information he “actively submit[s],” but such a rule is nowhere to be found in either Miller or Smith. Moreover, this purported requirement cannot be squared with the myriad of federal cases that per *384 mit the government to acquire third-party records, even when individuals do not “actively submit” the information contained in the records.
For starters, courts have attached no constitutional significance to the distinction between records of incoming versus outgoing phone calls. The technology the police used in Smith — a pen register — recorded only the numbers dialed by a suspect’s phone. It did not (and could not) record any information about incoming calls. To capture that information, police routinely use a “trap and trace” device. If the majority were correct that the third-party doctrine applies only when an individual “actively submit[s]” information, then any effort to acquire records of incoming phone calls would constitute a search protected by the Fourth Amendment. After all, the phone customer never “actively submits” to the phone company — “voluntarily or otherwise” — the numbers from incoming telephone calls. Only the user on the other end of the line, who actually dials the numbers, does so.
But federal courts have not required a warrant supported by probable cause to obtain such information. Rather, they routinely permit the government to install “trap and trace” devices without demonstrating probable cause or even reasonable suspicion, the showing required for § 2703(d) orders. See, e.g., United States v. Reed, 575 F.3d 900, 914 (9th Cir.2009); United States v. Hallmark, 911 F.2d 399, 402 (10th Cir.1990). And recently we held that police “did not violate the Fourth Amendment” when obtaining a defendant’s “cellular phone records,” even though the records included “basic information regarding incoming and outgoing calls on that phone line.” United States v. Clenney, 631 F.3d 658, 666-67 (4th Cir.2011) (emphasis added).[7]
Moreover, outside the context of phone records, we have held that third-party information relating to the sending and routing of electronic communications does not receive Fourth Amendment protection. United States v. Bynum, 604 F.3d 161, 164 (4th Cir.2010). In Bynum, we explained that it “would not be objectively reasonable” for a defendant to expect privacy in his phone and Internet subscriber records, including “his name, email address, telephone number, and physical address.” Id. Although we had no occasion in Bynum to consider whether an individual has a protected privacy interest in his Internet Protocol (IP) address, id. at 164 n. 2, several of our sister circuits have concluded that no such interest exists. See United States v. Suing, 712 F.3d 1209, 1213 (8th Cir. 2013); United States v. Christie, 624 F.3d 558, 574 (3d Cir.2010).
And as the majority itself recognizes, the Ninth Circuit has held that “e-mail and Internet users have no expectation of privacy in ... the IP addresses of the websites they visit.” United States v. Forrester, 512 F.3d 500, 510 (9th Cir.2008). The Forrester court also held that there is no reasonable expectation of privacy in either the to/from addresses of a user’s emails or the “total amount of data transmitted to or from [a user’s] account.” Id. at 510-11. The court found the government’s acquisition of this information “constitutionally *385 indistinguishable from the use of a pen register that the Court approved in Smith,” in part because “e-mail and Internet users, like the telephone users in Smith, rely on third-party equipment in order to engage in communication.” Id. at 510.
Of course, computer users do “actively submit” some of the information discussed in the above cases, like the “to” address in an email and the subscriber information conveyed when signing up for Internet service. But users do not actively submit other pieces of information, like an IP address or the amount of data transmitted to their account. Internet service providers automatically generate that information. See Christie, 624 F.3d at 563; Forrester, 512 F.3d at 511.
If the majority is correct that the Fourth Amendment protects information individuals do not “actively submit” to third parties, then it should trouble my colleagues that we and our sister circuits have consistently failed to recognize this protection. Yet nowhere in their opinion do my colleagues even attempt to grapple with these cases or to reconcile the rule they announce with the previous applications of the third-party doctrine. Today’s decision is a holding in search of a coherent legal principle; my colleagues have offered none.
C.
Instead, my colleagues rely on an argument long rejected by the Supreme Court and a series of cases involving the content of communications to support their holding that CSLI is protected by the Fourth Amendment.
First, my colleagues emphasize that cell phone use is “ubiquitous in our society today” and “essential to full cultural and economic participation.” To the majority, such “ubiquitous” and “essential” use shields CSLI from the consequences of the third-party doctrine. For, the majority contends, cell phone users cannot be held to voluntarily “forfeit expectations of privacy by simply seeking active participation in society through use of their cell phones.”
But the dissenting justices in Miller and Smith unsuccessfully advanced nearly identical concerns. Dissenting in Miller, Justice Brennan contended that “the disclosure by individuals or business firms of their financial affairs to a bank is not entirely volitional, since it is impossible to participate in the economic life of contemporary society without maintaining a bank account.” 425 U.S. at 451, 96 S.Ct. 1619 (Brennan, J., dissenting) (internal quotation marks and citation omitted). And dissenting in Smith, Justice Marshall warned that “unless a person is prepared to forgo use of what for many has become a personal or professional necessity,” i.e., a telephone, “he cannot help but accept the risk of surveillance.” 442 U.S. at 750, 99 S.Ct. 2577 (Marshall, J., dissenting). It was, in Justice Marshall’s view, “idle to speak of ‘assuming’ risks in contexts where, as a practical matter, individuals have no realistic alternative.” Id. The Supreme Court has thus twice rejected the majority’s “ubiquitous” and “essential” theory. Until the Court says otherwise, these holdings bind us.
Second, the majority relies on cases that afford Fourth Amendment protection to the content of communications to suggest that CSLI warrants the same protection. See Ex parte Jackson, 96 U.S. 727, 733, 6 Otto 727, 24 L.Ed. 877 (1877) (content of letters and packages); Katz v. United States, 389 U.S. 347, 353, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (content of telephone calls); United States v. Warshak, 631 F.3d 266, 287 (6th Cir.2010) (content of emails). What the majority fails to acknowledge is that for each medium of communication *386 these cases address, there is also a case expressly withholding Fourth Amendment protection from non-content information, i.e., information involving addresses and routing. See Jackson, 96 U.S. at 733, 96 U.S. 727 (no warrant needed to examine the outside of letters and packages); Smith, 442 U.S. at 743-44, 99 S.Ct. 2577 (no reasonable expectation of privacy in phone numbers dialed); Forrester, 512 F.3d at 510 (no reasonable expectation of privacy in the to/from addresses of emails); accord Jones, 132 S.Ct. at 957 (Sotomayor, J., concurring) (noting the Fourth Amendment does not currently protect “phone numbers” disclosed to phone companies and “e-mail addresses” disclosed to Internet service providers).
The Supreme Court has thus forged a clear distinction between the contents of communications and the non-content information that enables communications providers to transmit the content.[8] CSLI, which reveals the equipment used to route calls and texts, undeniably belongs in the non-content category.
My colleagues apparently disagree with this conclusion. They posit that CSLI is “of course more than simple routing information” because “it tracks a cell phone user’s location across specific points in time.” But all routing information “tracks” some form of activity when aggregated over time. The postmark on letters “tracks” where a person has deposited his correspondence in the mail; a pen register “tracks” every call a person makes and allows the government to know precisely when he is at home; credit card records “track” a consumer’s purchases, including the location of the stores where he made them. Of course, CSLI is not identical to any of these other forms of routing information, just as cell phones are not identical to other modes of communication. But it blinks at reality to hold that CSLI, which contains no content, somehow constitutes a communication of content for Fourth Amendment purposes.
That the majority attempts to blur this clear distinction[9] further illustrates the extent to which its holding is a constitutional outlier — untenable in the abstract and bizarre in practice. Case in point: As I understand the majority’s view, the government could legally obtain, without a warrant, all data in the Sprint/Nextel records admitted into evidence here, except the CSLI. If that is so, then the line in this case between a Fourth Amendment “search” and “not a search” is the literal line that, moving left to right across the *387 Sprint/Nextel spreadsheets, separates the seventh column from the eighth. See J.A. 2656; see also J.A. 1977-79. The records to the left of that line list the source of a call, the number dialed, the date and time of the call, and the call’s duration — all of which the government can acquire without triggering Fourth Amendment protection. The records to the right of that line list the cell phone towers used at the start and end of each call — information the majority now holds is protected by the Fourth Amendment. Constitutional distinctions should be made of sturdier stuff. -
III.
Technology has enabled cell phone companies, like Sprint/Nextel, to collect a vast amount of information about their customers. The quantity of data at issue in this case — seven months’ worth of cell phone records, spanning nearly 30,000 calls and texts for each defendant — unquestionably implicates weighty privacy interests.
At bottom, I suspect discomfort with the amount of information the government obtained here, rather than any distinction between CSLI and other third-party records, motivates today’s decision. That would certainly explain the majority’s suggestion that the government can acquire some amount of CSLI “before its inspection rises to the level of a Fourth Amendment search.”[10] But this concession is in fatal tension with the majority’s rationale for finding a Fourth Amendment violation here.[11] After all, the majority maintains that every piece of CSLI has the potential to “place an individual ... at the person’s home,” that no piece of CSLI is voluntarily conveyed, and that the government can never know before it acquires CSLI whether the information “will detail the cell phone user’s movements in private spaces.” If all of this is true (and I doubt it is)[12], then why does a cell phone user have a reasonable expectation of privacy in only large quantities of CSLI?
The majority’s answer appears to rest on a misunderstanding of the analysis embraced in the two concurring opinions in Jones. There, the concurring justices recognized a line between “short-term monitoring of a person’s movements on public streets,” which would not infringe a reasonable expectation of privacy, and “longer term GPS monitoring,” which would. Jones, 132 S.Ct. at 964 (Alito, J., concurring in the judgment); see also id. at 955 (Sotomayor, J., concurring). But Jones involved government surveillance of an individual, not an individual’s voluntary disclosure of information to a third party. *388 And determining when government surveillance infringes on an individual’s reasonable expectation of privacy requires a very different, analysis.
In considering the legality of the government surveillance at issue in Jones, Justice Alito looked to what a hypothetical law enforcement officer or third party, engaged in visual surveillance, could reasonably have learned about the defendant. He concluded that four weeks of GPS monitoring constituted a Fourth Amendment “search” because “society’s expectation” had always been “that law enforcement agents and others would not — and indeed, in the main, simply could not — secretly monitor and catalogue” an individual’s movements in public for very long. Id. at 964 (Alito, J., concurring in the judgment) (emphasis added). In other words, when a defendant has not disclosed his location to any particular third party, the government may nonetheless surveil him, without a warrant, for as long as a hypothetical third party could reasonably “monitor and cata-logue” his movements in person.
When, however, an individual has voluntarily conveyed his location to an actual third party, as Defendants did here, a court need not resort to hypotheticals to determine whether he justifiably expected that information to remain private. Here, we know that Defendants had already disclosed all the CSLI at issue to Sprint/Nex-tel before the government acquired the phone company’s records. And the very act of disclosure negated any reasonable expectation of privacy, regardless of how frequently that disclosure occurred. The majority ignores these critical facts, applying the same constitutional requirements for location information acquired directly through GPS tracking by the government to historic CSLI that has already been disclosed to a third party.
I recognize the appeal — if we were writing on a clean slate — in holding that individuals always have a reasonable expectation of privacy in large quantities of location information, even if they have shared that information with a phone company. But the third-party doctrine does not afford us that option. Intrinsic to the doctrine is an assumption that the quantity of information an individual shares with a third party does not affect whether that individual has a reasonable expectation of privacy. Although third parties have access to much more information now than they did when the Supreme Court decided Smith, the Court was certainly then aware of the privacy implications of the third-party doctrine. Justice Stewart warned the Smith majority that “broadcasting] to the world a list of the local or long distance numbers” a person has called could “reveal the most intimate details of [that] person’s life.” Smith, 442 U.S. at 748, 99 S.Ct. 2577 (Stewart, J., dissenting). That is, in essence, the very warning that persuades the majority today. But the Supreme Court was unmoved by the argument then, and it is not our place to credit it now. If individuals lack any legitimate expectation of privacy in information they share with a' third party, then sharing more non-private information with that third party cannot change the calculus.
Application of the third-party doctrine does not, however, render privacy an unavoidable casualty of technological progress. After all, Congress and state legislatures are far better positioned to respond to changes in technology than are the courts. See Jones, 132 S.Ct. at 964 (Alito, J., concurring in the judgment) (“A legislative body is well situated to gauge changing public attitudes, to draw detailed lines, and to balance privacy and public safety in a comprehensive way.”); see also In re Application (Fifth Circuit), 724 F.3d at 615 (explaining that that the proper “recourse” for those seeking increased priva *389 cy is often “in the market or the political process”).[13]
The very statute at issue here, the Stored Communications Act (SCA), demonstrates that Congress can — and does— make these judgments. The SCA imposes a higher burden on the government for acquiring “the contents of a wire or electronic communication” than for obtaining “a record ... pertaining to a subscriber ... or customer” of an electronic communication service. 18 U.S.C. §§ 2703(a), (c). And the SCA is part of a broader statute, the Electronic Communications Privacy Act of 1986 (ECPA), which was enacted in the wake of Smith. See Pub.L. No. 99-508, 100 Stat. 1848. In the ECPA, Congress responded directly to Smith’s holding by requiring the government to obtain a court order before installing a pen register or “trap and trace” device. See 18 U.S.C. § 8121(a). Although Congress could undoubtedly do more, it has not been asleep at the switch.
Ultimately, of course, the Supreme Court may decide to revisit the third-party doctrine. Justice Sotomayor has suggested that the doctrine is “ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks.” Jones, 132 S.Ct. at 957 (Sotomayor, J., concurring). Indeed, although the Court formulated the third-party doctrine as an articulation of the reasonable-expectation-of-privacy inquiry, it increasingly feels like an exception.[14] A per se rule that it is unreasonable to expect privacy in information voluntarily disclosed to third parties seems unmoored from current understandings of privacy.
The landscape would be different “if our Fourth Amendment jurisprudence cease[d] to treat secrecy as a prerequisite for privacy.” Id. But until the Supreme Court so holds, we are bound by the contours of the third-party doctrine as articulated by the Court. See, e.g., Agostini v. Felton, 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (reversing the Second Circuit but noting that it had correctly applied then-governing law, explaining that “if a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls” (internal quotation marks, alteration, and citation *390 omitted)). Applying the third-party doctrine, consistent with controlling precedent, I can only conclude that the Fourth Amendment did not protect Spi'int/Nex-tel’s records of Defendants’ CSLI. Accordingly, I would hold that the government legally acquired those records through § 2703(d) orders.
Time may show that my colleagues have struck the proper balance between technology and privacy. But if the majority is proven right, it will only be because the Supreme Court revises its decades-old understanding of how the Fourth Amendment treats information voluntarily disclosed to third parties. Today the majority endeavors to beat the Supreme Court to the punch. Respectfully, I dissent.

. My colleagues acknowledge this distinction but dismiss it as "inconsequential.” I cannot agree. It matters, for Fourth Amendment purposes, how the government acquires information. Just as the Supreme Court applies a different analysis depending on whether the government engages in a physical trespass, see United States v. Jones, - — U.S. -, 132 S.Ct. 945, 949-53, 181 L.Ed.2d 911 (2012), so too the Court applies a different analysis, in non-trespassory cases, depending on whether the information at issue was voluntarily disclosed to a third party. See Smith, 442 U.S. at 743-44, 99 S.Ct. 2577. Perhaps, in accord with the two lower court cases the majority cites, the Court will someday conclude that, given long-established statutory and common-law protections, the third-party doctrine does not apply to information a patient reveals to a doctor or a client to a lawyer — i.e., that the patient and client do have reasonable expectations of privacy in information conveyed in the course of these confidential relationships. But see 1 Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 2.7(d) (5th ed. 2012 & Supp. 2014). Clearly, however, the Court has already declined to recognize any reasonable expectation of privacy for information a phone company customer provides to the phone company. See Smith, 442 U.S. at 743-44, 99 S.Ct. 2577.

. See, e.g., United States v. Epstein, No. 14-287, 2015 WL 1646838, at *4 (D.N.J. Apr. 14, 2015) (Wolfson, J.); United States v. Dorsey, No. 14-328, 2015 WL 847395, at *8 (C.D.Cal. Feb. 23, 2015) (Snyder, J.); United States v. Lang, No. 14-390, 78 F.Supp.3d 830, 834-36, 2015 WL 327338, at *3-4 (N.D.Ill. Jan. 23, 2015) (St. Eve, J.); United States v. Shah, No. 13-328, 2015 WL 72118, at *7-9 (E.D.N.C. Jan. 6, 2015) (Flanagan, J.); United States v. Martinez, No. 13-3560, 2014 WL 5480686, at *3-5 (S.D.Cal. Oct. 28, 2014) (Hayes, J.); United States v. Rogers, No. 13-952, 2014 WL 5152543, at *3-4 (N.D.Ill. Oct. 9, 2014) (Kocoras, J.); United States v. Giddins, 57 F.Supp.3d 481, 491-94 (D.Md.2014) (Quarles, J.); United States v. Banks, 52 F.Supp.3d 1201, 1204-06 (D.Kan.2014) (Crabtree, J.); United States v. Serrano, No. 13-0058, 2014 WL 2696569, at *6-7 (S.D.N.Y. June 10, 2014) (Forrest, J.); United States v. Moreno-Nevarez, No. 13-0841, 2013 WL 5631017, at *1-2 (S.D.Cal. Oct. 2, 2013) (Benitez, J.); United States v. Rigmaiden, No. 08-814, 2013 WL 1932800, at *14 (D.Ariz. May 8, 2013) (Campbell, J.); United States v. Gordon, No. 09-153-02, 2012 WL 8499876, at *2 (D.D.C. Feb. 6, 2012) (Urbina, J.); United States v. Benford, No. 09-86, 2010 WL 1266507, at *2-3 (N.D.Ind. Mar. 26, 2010) (Moody, J.); In re Application of the U.S. for an Order Authorizing the Disclosure of Cell Site Location Info., No. 08-6038, 2009 WL 8231744, at *9-11 (E.D.Ky. Apr. 17, 2009) (Wier, Mag. J.); In re Applications of U.S. for Orders Pursuant to Title 18, U.S.Code Section 2703(d), 509 F.Supp.2d 76, 79-82 (D.Mass.2007) (Steams, J.). But see United States v. Cooper, No. 13-00693, 2015 WL 881578, at *6-8 (N.D.Cal. Mar. 2, 2015) (Illston, J.); In re Application of U.S.for an Order Authorizing the Release of Historical Cell-Site Info., 809 F.Supp.2d 113, 120-27 (E.D.N.Y.2011) (Garaufis, J.).

. Two of the state cases do not even Interpret the Fourth Amendment, but instead rely on broader state constitutional protections. See Commonwealth v. Augustine, 467 Mass. 230, 4 N.E.3d 846, 858 (2014) (finding "no need to wade into the[] Fourth Amendment waters” when the court could rely on article 14 of the Massachusetts Declaration of Rights); State v. Earls, 214 N.J. 564, 70 A.3d 630, 641-42 (2013) (explaining that New Jersey has "departed” from Smith and Miller and does not recognize the third-party doctrine). And the court in the third state case repeatedly pointed out that it was not considering "historical cell site location records”— like those at issue here — but "real time cell site location information," which had been obtained, not through a § 2703(d) order, but *382 under an order that had authorized only a "pen register” and “trap and trace device.” Tracey v. State, 152 So.3d 504, 506-08, 515-16, 526 (Fla.2014). Thus, contrary to my colleagues' charge, it is not the dissent, but rather cases on which the majority relies, thát "have suggested” that there are different privacy interests in "real-time” versus "historical” location information. See id..; see also In re Application of U.S. for an Order Authorizing Disclosure of Location Info, of a Specified Wireless Tel., 849 F.Supp.2d 526, 535-39 (D.Md.2011).

. My colleagues also emphasize the general "sensitivity]” of location information. But to the extent they do so to argue that the third-party doctrine does not apply to CSLI, they are mistaken. The third-party doctrine clearly covers information regarded as comparably "sensitive” to location information, like financial records, Miller, 425 U.S. at 442, 96 S.Ct. 1619, and phone records, Smith, 442 U.S. at 745, 99 S.Ct. 2577. Indeed, the public polling study the majority twice cites in attempting to establish the "sensitivity” of CSLI relates that a similar number of adults regard the phone numbers they call to be just as "sensitive” as location data. Pew Research Ctr., Public Perceptions of Privacy and Security in the Post-Snowden Era 34-35 (2014), http ://www.pewinternet. org/fíles/2 014/11/PI_ PublicPerceptionsof Privacy_111214.pdf. This is so even though the location data that the study asked about (GPS) is far more precise than the CSLI at issue here. See id. at 34.

. If it were otherwise, as my colleagues appear to believe, then courts would frequently need to parse business records for indicia of what an individual knew he conveyed to a third party. For example, when a person hands his credit card to the cashier at a grocery store, he may not pause to consider that he is also "conveying” to his credit card company the date and time of his purchase or the store’s street address. But he would hardly be able to use that as an excuse to claim an expectation of privacy if those pieces of information appear in the credit card company’s resulting records of the transaction. Cf. United States v. Phibbs, 999 F.2d 1053, 1077-78 (6th Cir.1993) (Defendant "did not have both an actual and a justifiable privacy interest in ... his credit card statements.”).

. Nor has this court ever suggested that other information typically contained in phone records — the date, time, and duration of each call, for example — merits constitutional protection/ Yet a phone customer never "actively submits” this information either. Rather, this information is, to borrow a phrase from the majority opinion, "quietly and automatically calculated” by the phone company "without unusual or overt intervention that might be detected by the target user." If individuals "voluntarily convey” all of this information to their phone companies, I see no basis for drawing the line at CSLI. Notably, the majority does not provide one.

. In addition to being firmly grounded in the case law, the content/non-content distinction makes good doctrinal sense. The intended recipient of the content of communication is not the third party who transmits it, but the person called, written, emailed, or sent texts. The routing and addressing information, by contrast, is intended for the third parties who facilitate such transmissions.

. I note that my concurring colleague’s concern about a general "erosion of privacy" with respect to cell phones rests on a similar misapprehension of this distinction. My friend worries about protecting the large quantity of information "stored on the phone and on remote servers.” And if all that information were indeed at risk of disclosure, I would share her concern. But the Supreme Court has already made clear that police must "get a warrant” to search a cell phone for content stored on the phone — even for a call log listing the phone numbers a suspect has dialed. Riley v. California,-U.S.-, 134 S.Ct. 2473, 2492, 2495, 189 L.Ed.2d 430 (2014). Moreover, the Riley Court suggested this rule would also apply to content stored on remote servers, i.e., the "cloud,” given that "the same type of data may be stored locally on the device for one user and in the cloud for another.” Id. at 2491. These are clear limiting principles. Holding, as I would, that the government may acquire, without a warrant, non-content routing information (including historical CSLI) would not send us down any slippery slope.

. It is unclear from my concurring colleague's opinion, which simply asserts that "cell site location information ... cannot be obtained without a warrant,” whether she agrees that the government can acquire a small quantity of CSLI without engaging in a Fourth Amendment "search.”

. The lack of a bright line between permissible and impermissible amounts of CSLI also stands at odds with the Supreme Court's "general preference to provide clear guidance to law enforcement through categorical rules.” Riley v. California,-U.S.-, 134 S.Ct. 2473, 2491, 189 L.Ed.2d 430 (2014). I do not envy the law enforcement officers and district courts in this circuit who now must attempt to divine this line.

.Contrary to the majority’s suggestion, and unlike the information in Karo and Jones, CSLI does not enable the government to "place an individual” at home or at other private locations. Each of the cell sites at issue here covers an area with a radius of up to two miles, and each data point of CSLI corresponds to a roughly 120-degree sector of a cell site's coverage area. That translates to an area of more than four square miles in which it would be possible to "locate” a cell phone user. Although I do not think the applicability of the Fourth Amendment hinges on the precision of CSLI, it is premature to equate CSLI with the far more accurate forms of surveillance the majority cites.

. The majority posits that it is our responsibility to ensure that "a technological advance alone cannot constrict Fourth Amendment protection for private matters that would otherwise be hidden or inaccessible.” But this is simply an incorrect statement of Fourth Amendment law. As the Supreme Court explained in Kyllo, "[i]t would be foolish to contend that the degree of privacy secured to citizens by the Fourth Amendment has been entirely unaffected by the advance of technology.” 533 U.S. at 33-34, 121 S.Ct. 2038. The "technology enabling human flight,” for example, "has exposed to public view ... uncovered portions of the house and its curti-lage that once were private.” Id. at 34, 121 S.Ct. 2038. And yet the Court held in California v. Ciraolo, 476 U.S. 207, 215, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986), and again in Florida v. Riley, 488 U.S. 445, 450, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989), that police observations of the curtilage from an aircraft do not implicate the Fourth Amendment. See Kyllo, 533 U.S. at 34, 121 S.Ct. 2038.

. Seizing on the word "exception,” my colleagues suggest that I advocate "an expansion” of the third-party doctrine. They misinterpret my statement as to what the third-party doctrine has become for a statement as to what the doctrine should be. This mistake is puzzling given my colleagues’ reliance on Justice Sotomayor’s opinion in Jones. It is clear from her opinion, though not from the majority’s retelling, that tailoring the Fourth Amendment to “the digital age” would, in Justice Sotomayor’s view, require the Supreme Court to "reconsider” the third-party doctrine. See Jones, 132 S.Ct. at 957 (Sotoma-yor, J., concurring).